**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| C.T., an individual, | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
|       v. | )   Case No. |
| | ) |
| RED ROOF INNS, INC.; | )   Judge: |
| Serve its Registered Agent: | ) |
| Corporation Trust Company | ) |
| Corporation Trust Center | ) |
| 1209 Orange Street | )   **JURY TRIAL DEMANDED** |
| Wilmington, Delaware 19801 | ) |
| | ) |
| | ) |
| WYNDHAM HOTELS & RESORTS, | ) |
| INC.; | ) |
| Serve its Registered Agent: | ) |
| Corporate Creations Network, Inc. | ) |
| 3411 Silverside Road | ) |
| Tatnall Building – Suite 104 | ) |
| Wilmington, Delaware 19810 | ) |
| | ) |
| | ) |
| BEST WESTERN INTERNATIONAL, | ) |
| INC.; | ) |
| Serve its Registered Agent: | ) |
| Corporation Service Company | ) |
| 2338 W. Royal Palm Road, Suite J | ) |
| Phoenix, Arizona 85021 | ) |
| | ) |
| | ) |
| LA QUINTA HOLDINGS, INC.; | ) |
| Serve its Registered Agent: | ) |
| | ) |

1

Corporate Creations Network, Inc.        )
)
3411 Silverside Road                     )
)
Tatnall Building – Suite 104             )
)
Wilmington, Delaware 19810              )
)
)
Defendants.              )

## COMPLAINT

COMES NOW the Plaintiff C.T., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry continues to neglect such criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2. Red Roof Inn, Inc. (hereinafter "RRI"), Wyndham Hotels & Resorts, Inc. (hereinafter "Wyndham"), Best Western International, Inc. (hereinafter "BWI"), and La Quinta Holdings, Inc. (hereinafter "LQH")[1] know and have known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Defendant Hotels have instead chosen to ignore the open and obvious presence of sex trafficking on their properties, enjoying the profit from rooms rented for this explicit and apparent purpose.

---

[1] Collectively, Wyndham, BWI, LQH, and RRI may be referred to as "Defendant Hotels."

3.    This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials C.T., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4.    Plaintiff, identified by her initials, C.T., is a survivor of sex trafficking. At the age of 19, Plaintiff was sold via commercial sex transactions at Defendants' hotel properties through force, fraud, and coercion. While she was trafficked at Defendants' hotel properties, C.T. was preyed upon by her traffickers who bought, sold, and required her to sexually service paying strangers as she endured brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at the Defendants' hotels for years as the Defendants did nothing but profit.

5.    The Plaintiff now brings this action for damages against the Defendants listed herein. Each of the Defendants, in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

6.    C.T. was advertised on www.craigslist.com and other websites, physically tortured, and sexually exploited under such duress at hotels, including the Days Inn, La Quinta Inn, Travelodge, Best Western, and Red Roof Inn.

7.    As a direct and proximate result of Defendant Hotels' consistent refusals to prevent human trafficking on their hotel properties, C.T. was sex trafficked, sexually exploited, and victimized repeatedly at Days Inn, Best Western, Travelodge, La Quinta, and Red Roof brand hotels.

8.    The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against the Defendants who enabled, harbored, held, facilitated, or otherwise financially benefited, or any combination of the foregoing, from a sex

trafficking venture in which C.T. was trafficked for sex, sexually exploited, and victimized in violation of the TVPRA.

## **PARTIES**

9.  Plaintiff C.T. is a natural person who is a resident and citizen of Florida.

    a.  Plaintiff C.T. was 19 years old when she was first sold for the purposes of commercial sex. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14).

    b.  Due to the sensitive and intimate nature of the issues, Plaintiff C.T. requests this Court to grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter.[2]

    c.  Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[4] For good cause, the Court may issue an order to protect a party or person from annoyance,

---

[2]    In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3]    Fed. R. Civ. P. 10(a).

[4]    A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g.,M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir.); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

embarrassment, oppression, or undue burden or expense.[5]

d.  Here, pseudonym status and to proceed under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears stigma from her family, friends, employer, and community if her true identity was revealed in the public record.

e.  Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[6]

f.  Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personally identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identities in a manner that will compromise her personal life or future employment prospects.

10.  Defendant Wyndham Hotels and Resorts, Inc. ("Wyndham") is one of the largest hotel brands in the world with nearly 9,000 branded properties in more than eighty (80) countries. It is a Delaware corporation and can be served by its registered agent Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building Suite 104, Wilmington, Delaware 19810.

a.  Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to

---

[5]      Fed. R. Civ. P. 26(c).
[6]      *Does I thru XXIII v. Advanced Textile Corp.,* supra n.2 at 1068 (the court joined its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

Wyndham Worldwide Corporation. Defendant Wyndham Hotels and Resorts, Inc. retains successor liability for wrongful acts of its predecessor Wyndham Worldwide Corporation.

b.  Days Inn® by Wyndham ("Days Inn®") is a Wyndham Hotels and Resorts, Inc. brand property. Wyndham owns, supervises, and/or operates the Days Inn® located at 11435 S. Cleveland Avenue  Fort Myers, Florida 33907.

   i.  Defendant Wyndham and the Days Inn® by Wyndham are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Days Inn® by Wyndham Defendant hotel where the Plaintiff was trafficked for sex. Defendant Wyndham and the Days Inn® by Wyndham each share the common policies and practices complained of herein.

   ii.  Defendant Wyndham and the Days Inn® jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

   iii.  As an integrated enterprise and or joint employer, Defendant Wyndham and the Days Inn® are separately and jointly responsible for compliance with all applicable laws.

   iv.  As an integrated enterprise and or joint employer, Defendant Wyndham and the Days Inn® are jointly and severally liable for any damages caused by employees.

   v.  As a hotel operator, Defendant controls the training and human trafficking or other related policies, including decisions on

implementation and execution of policy for its branded properties including the Days Inn® hotel where C.T. was trafficked. Through its relationship with the staff at the Days Inn® where C.T. was trafficked and the perpetrator who trafficked C.T. at Days Inn® hotels, Defendant Wyndham knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

vi. Wyndham benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

c. In 2006, Travelodge® ("Travelodge®") properties were acquired by Wyndham Hotels and Resorts, Inc. ("Wyndham"), who currently owns, supervises, and/or operates the Travelodge® located at 4760 S. Cleveland Avenue Fort Myers, Florida 33907.

i. Defendant Wyndham and the Travelodge® by Wyndham are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Travelodge® by Wyndham Defendant hotel where the Plaintiff was trafficked for sex. Defendant Wyndham and the Travelodge® by Wyndham each share the common policies and practices complained of herein.

ii. Defendant Wyndham and the Travelodge® jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

iii. As an integrated enterprise and or joint employer, Defendant Wyndham

and the Travelodge® are separately and jointly responsible for compliance with all applicable laws.

iv. As an integrated enterprise and or joint employer, Defendant Wyndham and the Travelodge® are jointly and severally liable for any damages caused by employees.

v. As a hotel operator, Defendant Wyndham controls the training and human trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties including the Travelodge hotel where C.T. was trafficked.

vi. Through its relationship with the staff at the Travelodge® where C.T. was trafficked and the perpetrator who trafficked C.T. at Travelodge® hotels, Defendant Wyndham knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

vii. Wyndham benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

11. Defendant Best Western International, Inc. ("BWI") is one of the largest hotel brands in the world. It is a global network of more than 4,200 hotels. It is an Arizona corporation and can be served by its registered agent Corporation Service Company, 2338 W. Royal Palm Road, Suite J Phoenix, Arizona 85021.

a. Best Western® is a BWI brand property. BWI owns, supervisors, and/or operates the Best Western® located at 4400 Ford Street Fort Myers, Florida 33916.

b. Defendant BWI and the Best Western® are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Best Western® hotel where the Plaintiff was trafficked for sex. Defendant BWI and the Best Western® each share the common policies and practices complained of herein.

c. Defendant BWI and the Best Western® jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

d. As an integrated enterprise and or joint employer, Defendant BWI and the Best Western® are separately and jointly responsible for compliance with all applicable laws.

e. As an integrated enterprise and or joint employer, Defendant BWI and the Best Western® are jointly and severally liable for any damages caused by employees.

f. As hotel operator, Defendant BWI controls the training and human trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties including the Best Western® hotel where C.T. was trafficked.

g. Defendant BWI maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with BWI brand standards and all local, state, and federal laws.

h. Through its relationship with the Best Western® hotel where C.T. was trafficked and the perpetrator who trafficked C.T. at the Best Western® hotel, Defendant BWI knowingly benefited or received something of value from its

9

facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

i. BWI benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

12. Defendant La Quinta Holdings, Inc. ("LQH") is a large hotel brand. It is an Oregon corporation and can be served by its registered agent, Corporate Creations Network Inc., at 3411 Silverside Road – Tatnall Building, Suite 104, Wilmington, Delaware 19810.

a. La Quinta Inn® is a LQH brand property. LQH owns, supervisors, and/or operates the La Quinta Inn® located at 4850 S. Cleveland Avenue Fort Myers, Florida 33907.[7]

b. Defendant LQH and the La Quinta Inn® are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the La Quinta Inn® hotel where the Plaintiff was trafficked for sex. Defendant LQH and the La Quinta Inn® each share the common policies and practices complained of herein.

c. Defendant LQH and the La Quinta Inn® jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

d. As an integrated enterprise and or joint employer, Defendant LQH and the La Quinta Inn® are separately and jointly responsible for compliance with all applicable laws.

e. As an integrated enterprise and or joint employer, Defendant LQH and the La

---

[7] Upon information and belief, as of May 2019, the La Quinta hotel brand was acquired by Defendant Wyndham. However, during the time that Plaintiff C.T. was trafficked for sex in Fort Myers, the La Quinta Inn was owned, managed, supervised, and/or operated by Defendant LQH.

Quinta Inn® are jointly and severally liable for any damages caused by employees.

f.  As hotel operator, Defendant LQH controls the training and human trafficking or other related policies for its branded properties including decisions on implementation and execution of policy for its branded properties including the La Quinta Inn® hotel where C.T. was trafficked.

g.  Defendant LQH maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with LQH brand standards and all local, state, and federal laws.

h.  Through its relationship with the La Quinta Inn® hotel where C.T. was trafficked and the perpetrator who trafficked C.T. at the La Quinta Inn® hotel, Defendant LQH knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

i.  LQH benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

13.  Defendant Red Roof Inns, Inc. ("RRI") is a large hotel brand. It is an Ohio corporation and can be served by its registered agent, The Corporation Trust Company, Corporation Trust Center at 1209 Orange Street, Wilmington, Delaware 19801.

a.  Red Roof Inn has its principal place of business in New Albany, Ohio, where all of the important corporate functions of the Red Roof brand are coordinated.

b.  Red Roof Inn® is a RRI brand property. RRI owns, supervisors, and/or

operates the Red Roof Inn® located at 13000 North Cleveland Avenue Fort Myers, Florida 33903.

c. Defendant RRI and the Red Roof Inn® are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Red Roof Inn® hotel where the Plaintiff was trafficked for sex. Defendant RRI and the Red Roof Inn® each share the common policies and practices complained of herein.

d. Defendant RRI and the Red Roof Inn® jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

e. As an integrated enterprise and or joint employer, Defendant RRI and the Red Roof Inn® are separately and jointly responsible for compliance with all applicable laws.

f. As an integrated enterprise and or joint employer, Defendant RRI and the Red Roof Inn® are jointly and severally liable for any damages caused by employees.

g. As hotel operator, Defendant RRI controls the training and human trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties including the Red Roof Inn® hotel where C.T. was trafficked.

h. Defendant RRI maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with RRI brand standards and all local, state, and federal laws.

    i.   Through its relationship with the Red Roof Inn® hotel where C.T. was trafficked and the perpetrator who trafficked C.T. at the Red Roof Inn® hotel, Defendant RRI knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

    j.   RRI benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

14.  Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

15.  This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.)

16.  Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

17.  The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by

13

receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

18. Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

19. To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

20. Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long- recognized and familiar atrocity.

## FACTUAL ALLEGATIONS

### A.     THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels*

14

*at some point during their exploitation… Unfortunately, 94% also disclosed that they never*

*received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project*[8]

21.   Human trafficking is the world's fastest growing crime.[9] While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[10]

22.   Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

23.   The hospitality industry plays a crucial role in the sex trade.[11] The trope of the "no-tell motel" is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

24.   According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[12] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

25.   Traffickers use hotels as the hub of their operations. Inside, the victims are harbored,

---

[8] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).
[9] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[10] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.
[11] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[12] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. This is referred to as an 'in call'.

26.  Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e. those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[13]

27.  The problem is industry wide. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[14]

28.  Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[15] Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

29.  Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.[16]

30.  But aside from their unique position in this epidemic, hotels and motels have the

---

[13] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY,    SCHOOL    OF    HOTEL    ADMINISTRATION    (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[14] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[15] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).
[16] *Combating Human Trafficking in the Hotel Industry*, HUFFPOST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 (last visited November 18, 2019).

highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[17]

31.  Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[18]

32.  From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

33.  Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in

---

[17] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[18] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[19]

34.  Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[20] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

35.  Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[21]

36.  The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

37.  At the General Assembly of the United Nations ("UN") convened in New York, New York in November 2000, the Palermo Protocol to prevent, suppress, and punish trafficking in persons was adopted.[22]

38.  In this regard, End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[23]

39.  The Code identifies the following six (6) steps companies can take to prevent child

---

[19] *Id*. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[20] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[21] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp- content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[22] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, *adopted* Nov. 15, 2000, 2237 U.N.T.S. 319.

[23] ECPAT-USA, *No Vacancy For Child Sex Traffickers Impact Report* (2017), *available at*: https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b8c/1506391761747/NoVacany_Report.pdf.

sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.

40.  In 2010, the United States government released its Trafficking in Persons Report, which included an assessment of trafficking in the United States. The Trafficking in Persons Report 2010 stated that approximately 12.3 million adults and children were in forced labor, bonded labor, and force prostitution around the world, but that only 4,166 trafficking prosecutions were successful in 2009.[24]

41.  During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity. It out to concern every community, because it tears at our social fabric. It ought to concern every business, because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[25]

42.  Statistics released in 2014 by the International Labor Organization ("ILO") showed that approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion

[24] CNN Wire Staff, *U.S. human trafficking report includes U.S. cases for first time*, CNN.com (Jun. 14, 2010), available at https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.
[25] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.

dollars for sex traffickers worldwide.[26] Put another way, the numbers showed that a sex trafficker's annual profit per victim was approximately $22,000.00.[27]

43.  A scholarly article published in 2015 estimated that pimps could earn $25,000.00 to $33,000.00 per week selling in the Atlanta, Georgia area.[28] This volume of and profit from sex trafficking also aligned with internet advertising for the sex trafficking industry occurring in roughly the same time period. For example, in 2015, one advertisement in the Atlanta section of the www.backpage.com website triggered 181 clients, and calls or texts from twenty-seven (27) men expressing interest – in a span of just ninety (90) minutes.[29]

44.  In December 2015, President Obama appointed eleven (11) survivors of human trafficking to the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[30]

45.  The United States Department of Justice ("DOJ") brought 248 sex trafficking prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.[31] In the previous year, DOJ convicted a total of 184 human traffickers (inclusive of labor trafficking) and in the subsequent year, DOJ convicted a total of 439 human traffickers (inclusive of labor trafficking).[32]

46.  Despite these efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole, continued to lag behind in its

---

[26] International Labour Office, *Profits and Poverty: The Economics of Forced Labour* (2014), at 13, *available at* https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.
[27] *Id.* at 15.
[28] Sarkisian, supra n.16, at 4.
[29] *Id.* at 5.
[30] U.S. Dep't of State, *2016 Trafficking in Persons Report* (2016), at 41, *available at* https://www.state.gov/documents/organization/258876.pdf.
[31] *Id.* at 389.
[32] Human Rights First, *Fact Sheet 2017* (2017), *available at* http://www.humanrightsfirst.org/sites/default/files/TraffickingbytheNumbers.pdf.

efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[33]

47.    Even estimates by attorneys *for the* hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[34] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.[35]

48.    Between 2007 and March 2015, more than 1,400 human trafficking cases have been reported to the National Trafficking Resource Center.[36]

49.    The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with hotel chains – they know it is unlikely that they will be disturbed.

50.    Due to the hospitality industry's failure to embrace anti-trafficking policies and practices, children and other vulnerable persons are trafficked for sex in hotels throughout the United States.

51.    In 2011, Wyndham Hotels trained only some of its employees to look for signs of

---

[33] Sarkisian, *supra* n.16.
[34] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[35] U.S. Dep't of State, *supra* n.31, at 387.
[36] Polaris, *Human Trafficking and the Hotel Industry* (2015), *available at* https://polarisproject.org/resources/human-trafficking-and-hotel-industry.

trafficking.[37]

52.    Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[38] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[39]

53.    Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

**B.    THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY**

54.    Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or a third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract and still profits from putting heads in beds.

55.    The average consumer does not see this relationship. The parent brand gives the franchisee property its identity. It provides signage on and in front of the building that

---

[37] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.
[38] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[39] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand. The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

56. In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, booking and room reservations are controlled by the corporate parent brand.[40]

57. The franchise hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

58. Per the franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

59. At the time of the incidents alleged herein:

    a. Defendant Wyndham owned and controlled the Days Inn® brand.

    b. Defendant Wyndham owned and controlled the Travelodge® brand.

    c. Defendant BWI owned and controlled the Best Western® brand.

    d. Defendant LQH owned and controlled the La Quinta Inn® brand.

    e. Defendant Red Roof Inns, Inc. owned and controlled the Red Roof Inn® brand.

60. Parent hotel brands may kick delinquent hotels out of their system but it is at the

---

[40] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

expense of terminating their royalty payments.

### C.    THE DEFENDANTS' ACTUAL AND/OR CONSTRUCTIVE KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTELS

61.    Defendant Hotels Wyndham, BWI, LQH, and RRI have been on notice of repeated incidences of sex trafficking occurring at their Days Inn®, Best Western, Travelodge, La Quinta Inn, and Red Roof Inn hotels, yet these brand managers failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

62.    Several courts have found that failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[41]

63.    WYNDHAM HOTELS AND REORTS, INC. ("WYNDHAM"):

   a.    Defendant Wyndham owns, supervises, or operates the Days Inn® located at 11435 S. Cleveland Ave.  Ft. Myers, FL 33907. Wyndham failed to implement and enforce any of its own policy or policies and protect Plaintiff C.T. from being sex trafficked.

   b.    For years Defendant Wyndham has been on notice of repeated incidences of sex trafficking occurring on its Days Inn® by Wyndham and Travelodge® by Wyndham branded properties, yet Defendant Wyndham has failed to take action to prevent sex trafficking at Days Inn® by Wyndham and Travelodge® by Wyndham brand properties and still persists in failing to take necessary action to prevent sex trafficking on its properties. Defendant Wyndham's inattention in this regard enabled and contributed to the sex trafficking the Plaintiff suffered at the Days Inn® by Wyndham and Travelodge® by

---

[41] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (.E.D. Tenn. May 29, 2007).

Wyndham hotels.

c.  There are numerous examples across place and time of Defendant Wyndham's knowledge of sex trafficking on its branded properties and its continued, total inattention to preventing and remedying the blight of human trafficking on the lives and liberties of its victims.

d.  In 2011, Defendant Wyndham's predecessor entity Wyndham Worldwide Corporation, signed the Code, but as evidenced by the widespread sex trafficking which continued to occur at Defendant Wyndham's branded properties, Defendant Wyndham did not practice what it preached. Defendant Wyndham's adoption of the Code appears to have been nothing more than a strategic maneuver through which it sought a shield against liability but not a sword against human trafficking.

e.  Despite Defendant Wyndham's anti-trafficking stance, Defendant Wyndham failed to implement and enforce any of its own policy or policies including with respect to the Days Inn® by Wyndham and Travelodge® by Wyndham. Defendant Wyndham knew or should have known that the Days Inn®  by Wyndham was located in an area known for sex trafficking activity, and sex trafficking and prostitution continued to regularly occur on and around their branded hotel premises, including when C.T. was trafficked.[42] Despite having

---

[42] *See, e.g., Alexis Stevens,* Atlanta Journal-Constitution, *Four Accused Of Running Prostitution Ring At Clayton County Hotels* (Jan. 12, 2016), https://www.ajc.com/news/crime--law/accused-running-prostitution-ring-claytoncounty-
hotels/gPhfieHiNuiov9xM0CmmJO/ (undercover investigation leads to arrests at Atlanta-area Days Inn by Wyndham); *Brian Newlin,* ClickOnDetroit.com, *Man Accused Of Getting Women Hooked On Drugs, Forcing Them Into Prostitution In Southeast Michigan* (Mar. 28, 2018), https://www.clickondetroit.com/news/man-accused-offorcing-women-into-prostitution-in-southeast-michigan (three women held against their will and forced into prostitution at Days Inn); *Matt Johnson,* WSBTV-Atlanta, *Fourteen-Year-Old Among Girls Saved From Motel Prostitution Ring, Police Say* (Mar. 9, 2018), https://www.wsbtv.com/news/local/cobb-county/14-year-old-

knowledge of the extensive prostitution and sex trafficking that occurs at its branded hotels, Defendant Wyndham failed to take adequate measures to prevent the misconduct.

f. Defendant Wyndham had actual knowledge of sex trafficking occurring on its branded hotel properties because Wyndham, Days Inn, and Travelodge knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Wyndham and Days Inn allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Days Inn. Wyndham and Days Inn facilitated the trafficking through its practices, policies, and procedures. Wyndham, Days Inn, and the Travelodge failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham, Days Inn, and Travelodge could continue to profit from the business that trafficking brings, including business from out-of-state.

g. Defendant Wyndham had constructive knowledge of sex trafficking occurring on its branded hotel properties because Wyndham, Days Inn, and Travelodge knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Wyndham, Days Inn,

amonggirls-saved-from-motel-prostitution-sting-police-say/713242739 (police save 14-year-old from pimps at Days Inn); *Andrea Gallo*, The Advocate, *Baton Rouge Passes Ordinance To Curb Sex Trafficking, Drugs, Prostitution At Hotels* (Jan. 24, 2018), https://www.theadvocate.com/baton_rouge/news/article_ac478eb0-0132-11e8-be36-6bb6c3a45ac0.html (frequency of police calls from Days Inn leads to action by Baton Rouge City Council).

26

and Travelodge allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Days Inn and Travelodge hotels. Wyndham, Days Inn, and Travelodge facilitated the trafficking through its practices, policies, and procedures. Wyndham, Days Inn, and Travelodge failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham, Days Inn, and Travelodge could continue to profit from the business that trafficking brings, including business from out-of-state.

h.  Wyndham knew or should have known that the Days Inn® and Travelodge® hotel where Plaintiff C.T. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff C.T. was trafficked.

i.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Wyndham has repeatedly failed to stop these actions.

j.  Defendant Wyndham exercised control over Days Inn® and Travelodge® hotels by:

    i.  distributing information to assist employees in identifying human trafficking;

    ii.  providing a process for escalating human trafficking concerns within the organization;

    iii.  requiring employees to attend training related to human trafficking;

    iv.  providing new hire orientation on human rights and corporate responsibility;

27

      v.   providing training and education to Days Inn® branded hotels through webinars, seminars, conferences, and online portals;

     vi.   developing and holding ongoing training sessions on human trafficking; or

    vii.   providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

k.  Wyndham was in an agency relationship with Days Inn® and Travelodge® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Wyndham's exercise of an ongoing and systemic right of control over Days Inn® and Travelodge® hotels by Defendant Wyndham's operations, including the means and methods of how Days Inn® and Travelodge® branded hotels conducted daily business through one or more of the following actions:

      i.   hosting online bookings on Defendant Wyndham's domain;

     ii.   requiring Days Inn® and Travelodge® branded hotels to use Defendant Wyndham's customer rewards program;

    iii.   setting employee wages;

    iv.   making employment decisions;

     v.   advertising for employment;

     vi.   sharing profits;

    vii.   standardized training methods for employees;

   viii.   building and maintaining the facility in a manner specified by the owner;

    ix.   standardized or strict rules of operation;

          x.   regular inspection of the facility and operation by owner;

         xi.   fixing prices; or

        xii.   other actions that deprive Days Inn® and Travelodge ®branded hotels of independence in business operations.

l.   An apparent agency also exists between Defendant Wyndham, Days Inn, and Travelodge hotels. Defendant Wyndham held out Days Inn® and Travelodge® branded hotels to the public as possessing authority to act on its behalf.

m.   Given Defendant Wyndham's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Days Inn® and Travelodge® branded hotels, Defendant Wyndham breached its duties in the following ways:

          i.   did not adequately distribute information to assist employees in identifying human trafficking;

         ii.   failed to provide a process for escalating human trafficking concerns within the organization;

        iii.   failed to mandate managers, employees, or owners attend training related to human trafficking;

        iv.   failed to provide new hire orientation on human rights and corporate responsibility;

         v.   failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

        vi.   failed to develop and hold or require ongoing training sessions on human trafficking; or

      vii.  failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

n.  For years, Defendant Wyndham has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Days Inn® and Travelodge® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff C.T. at Days Inn® and Travelodge® hotels that forms the basis of this complaint.

      i.  In July 2008, a woman was arrested during a police stakeout at a Days Inn and charged with prostitution for allegedly trading sex for gasoline, while the buyer was charged with promoting prostitution.[43]

      ii.  In February 2010, a prostitution sting that started with a Craigslist ad ended with three metro Atlanta women and a 15-year-old Atlanta girl being arrested at a Days Inn hotel.[44]

      iii.  In March 2010, a high-profile personal injury lawyer was arrested by Petersburg Police at a Travelodge motel on charges of soliciting a prostitute.[45]

      iv.  In 2014, after several undercover operations, detectives discovered women advertising themselves on websites and directing their customers

---

[43] Sex for Gas, THE SMOKING GUN (Jul. 2, 2008), http://www.thesmokinggun.com/documents/crime/sex-gas.

[44] Larry Hartstein, *Craigslist prostitution sting nets 4 arrests*, THE ATLANTA JOURNAL-CONSTITUTION (Feb. 9, 2010), https://www.ajc.com/news/local/craigslist-prostitution-sting-nets-arrests/HvY72Eh4nKE1Ej7jo4WIyH/

[45] *Top Lawyer Arrested for Soliciting Prostitute*, STYLE WEEKLY (Apr. 28, 2010), https://www.styleweekly.com/richmond/top-lawyer-arrested-for-soliciting-prostitute/Content?oid=1383889.

to the Mission Valley Travelodge. As a result, the San Diego City Attorney's Office ordered the Travelodge to increase security and make immediate changes in order to crack down on prostitution activity on the premises.[46]

v. Additionally, Defendant Wyndham has been aware of sex trafficking on Days Inn and Travelodge brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Days Inn and Travelodge brand properties and Defendant Wyndham's inattentiveness, for example:

- In September of 2007, a reviewer described a Days Inn in Spartanburg, South Carolina as follows: "When leaving the room, two prostitutes informed us that, 'We've used most of the rooms here and they were fine.' We left and stayed at the Choice Inn across the road."[47]

- In July 2009, a reviewer described the Travelodge Lake Erie Sandusky as "Great Value… for Prostitutes/Drug Dealers to do business!"[48]

- Regarding a February 2012 stay at a Travelodge in Ozone

---

[46] *Another Mission Valley Hotel Ordered to Curb Prostitution Activity*, NBC SAN DIEGO (Feb. 4, 2014), https://www.nbcsandiego.com/news/local/Mission-Valley-Travelodge-Hotel-Prostitution-Crackdown-243554781.html.
[47] Review of Days Inn by Wyndham Spartanburg Waccamaw, Spartanburg, SC (Sept. 29, 2007), *available at* https://www.tripadvisor.com/ShowUserReviews-g54448-d97597-r10019529-Days_Inn_by_Wyndham_Spartanburg_Waccamaw-Spartanburg_South_Carolina.html.
[48] Review of Travelodge Lake Erie Sandusky, Sandusky, OH (Jul. 27, 2009), available at http://www.thesmokinggun.com/documents/crime/sex-gas.

Park, New York, a customer wrote a review titled, "Prostitute central" and continued to explain: "Checked in for an overnight stay before leaving from Kennedy airport. Had a young lady before be (sic) checking in asking for extra sheets, hmmm. After getting in to our room we heard activities (if you know what I mean) going on in the room next to us all night along with arguing, etc. when checking out there was a "young lady" arguing with the police at the counter. Don't tell me the management doesn't know what's going on here. Do yourself a favor and find another place to stay."[49]

- In October of 2012, a reviewer described the Days Inn in Fort Myers, Florida as follows: "thought I was staying in a crackhead/prostitute hotel. [Y]our corporate office [should] really look at this place. [T]here were hookers conducting business right outside my front door and [I] had my children with me!"[50]

- In August of 2015, a reviewer described the Days Inn in Fort Myers, Florida as follows: "This motel is filled with drug dealers and prostitutes. The owner/[management] is

---

[49]   Review of the Travelodge by Wyndham Ozone Park (Feb. 22, 2012), *available at* https://www.tripadvisor.com/ShowUserReviews-g48355-d1474489-r125023778-Travelodge_by_Wyndham_Ozone_Park-Ozone_Park_Queens_New_York.html.
[50]   Review of Days Inn by Wyndham Fort Myers, Fort Myers, FL (Oct. 10, 2012), *available at* https://www.tripadvisor.com/ShowUserReviews-g34230-d84524-r142467996-Days_Inn_by_Wyndham_Fort_Myers-Fort_Myers_Florida.html.

well aware of this and does nothing about it. While there a woman overdosed and the police were there four times in other drug related issues... ”[51]

- Regarding a June 2016 stay at the Travelodge in Fort Myers, Florida, a customer wrote: "This place is dirty. And plus the prostitutes and druggies that I saw was nasty. Even the maintenance man lives there and had prostitutes and drug addicts in his room. Horrible place!!"[52]

- Regarding an April 2017 stay at a Travelodge in West Springfield, Massachusetts, a customer wrote: "Prostitution is bad bad here all week long and the week end is worse!do not stay here! No sleep from people make so much noise,in the rooms and out side. Management does nothing to combat it! Could be a nice place if they clean it up, prostitution, and drugs ect. Police needs to stake it out" (sic).[53]

64. BEST WESTERN INTERNATIONAL, INC. ("BWI")

   a. Defendant BWI owns, supervises, or operates the Best Western located at 4400 Ford Street Fort Myers, Florida 33916. BWI failed to implement and enforce

---

[51] Review of Days Inn by Wyndham Fort Myers, Fort Myers, FL (Aug. 1, 2015), *available at* https://www.tripadvisor.com/ShowUserReviews-g34230-d84524-r294688173-Days_Inn_by_Wyndham_Fort_Myers-Fort_Myers_Florida.html.
[52] Review of the Travelodge by Wyndham Fort Myers (Jul. 8, 2016), *available at* https://www.tripadvisor.com/ShowUserReviews-g34230-d84533-r390411430-Travelodge_by_Wyndham_Fort_Myers-Fort_Myers_Florida.html.
[53] Review of Travelodge West Springfield (Apr. 2, 2017), *available at* https://www.tripadvisor.com/ShowUserReviews-g41916-d1382745-r472028362-Travelodge_West_Springfield-West_Springfield_Massachusetts.html.

any of its own policy or policies and protect Plaintiff C.T. from being sex trafficked.

b. Defendant BWI had actual knowledge of sex trafficking occurring on its branded hotel properties because BWI and Best Western knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. BWI and Best Western allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Best Western. BWI and Best Western facilitated the trafficking through its practices, policies, and procedures. BWI and Best Western failed to take appropriate action to prevent the trafficking of individuals for sex so that BWI and Best Western could continue to profit from the business that trafficking brings, including business from out-of-state

c. Defendant BWI had constructive knowledge of sex trafficking occurring on its branded hotel properties because BWI and Best Western knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. BWI and Best Western allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Best Western. BWI and Best Western facilitated the trafficking through its practices, policies, and procedures. BWI and Best Western failed to

take appropriate action to prevent the trafficking of individuals for sex so that BWI and Best Western could continue to profit from the business that trafficking brings, including business from out-of-state.

d. BWI knew or should have known that the Best Western® hotel where Plaintiff C.T. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff C.T. was trafficked.

e. Best Western brand hotel properties know and have known for more than a decade that criminal sex trafficking of adults and children repeatedly occurs on their properties throughout the country. Rather than take timely and effective measures to prevent human trafficking, Best Western brand hotels, and their respective parent companies, have instead failed to address the open and obvious presence of human trafficking on hotel properties and continue to profit from traffickers renting rooms for the explicit and readily apparent purpose of human trafficking.

f. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant BWI has repeatedly failed to stop these actions.

g. Defendant BWI exercised control over Best Western® hotels by:

    i. distributing information to assist employees in identifying human trafficking;

    ii. providing a process for escalating human trafficking concerns within the organization;

iii.  requiring employees to attend training related to human trafficking;

iv.  providing new hire orientation on human rights and corporate responsibility;

v.  providing training and education to Best Western® branded hotels through webinars, seminars, conferences, and online portals;

vi.  developing and holding ongoing training sessions on human trafficking; or

vii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

h.  BWI was in an agency relationship with Best Western® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant BWI's exercise of an ongoing and systemic right of control over Best Western® hotels by Defendant BWI operations, including the means and methods of how Best Western® branded hotels conducted daily business through one or more of the following actions:

i.  hosting online bookings on Defendant BWI's domain;

ii.  requiring Best Western® branded hotels to use Defendant BWI's customer rewards program;

iii.  setting employee wages;

iv.  making employment decisions;

v.  advertising for employment;

vi.  sharing profits;

vii.  standardized training methods for employees;

viii.  building and maintaining the facility in a manner specified by the owner;

ix.  standardized or strict rules of operation;

x.  regular inspection of the facility and operation by owner;

xi.  fixing prices; or other actions that deprive Best Western® branded hotels of independence in business operations.

i.  An apparent agency also exists between Defendant BWI and Best Western® hotels. Defendant BWI held out Best Western® branded hotels to the public as possessing authority to act on its behalf.

j.  Given Defendant BWI's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Best Western® branded hotels, Defendant BWI breached its duties in the following ways:

i.  did not adequately distribute information to assist employees in identifying human trafficking;

ii.  failed to provide a process for escalating human trafficking concerns within the organization;

iii.  failed to mandate managers, employees, or owners attend training related to human trafficking;

iv.  failed to provide new hire orientation on human rights and corporate responsibility;

v.  failed to provide training and education on human trafficking through

webinars, seminars, conferences, and online portals;

vi. failed to develop and hold or require ongoing training sessions on human trafficking; or

vii. failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

k. For years, Defendant BWI has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Best Western® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff C.T. at Best Western® hotels that forms the basis of this complaint.

i. In July 2007, a manager of two Best Western hotels publicly announced that they had banned "prostitution related activities" on their premises, which included training employees how to identify prostitution and denying entry to suspected prostitutes and their clients.[54]

ii. In October 2007, a Best Western construction in the middle of an industrial area raised concerns from the local community about the hotel becoming a den of prostitution. Community board members and residents requested the hotel's owner to answer all of their questions about the site and provide details about the rooms, management, parking, and security.

---

[54] *Businesses Say No to Sex Tourism Industry*, THE TICO TIMES (Jul. 27, 2007), https://ticotimes.net/2007/07/27/businesses-say-no-to-sex-tourism-industry.

The building of hotels in industrial areas had become such a problem that the Borough President had called for a moratorium on such facilities in industrial areas.[55]

iii. In October 2008, two women were arrested on drug charges in a prostitution sting and eight men were arrested for soliciting sex at the Best Western Hotel in Rockland.[56]

iv. Additionally, Defendant BWI has been aware of sex trafficking on Best Western brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Best Western brand properties and Defendant BWI's inattentiveness, for example:

- Regarding a March 2016 stay at a Best Western Executive Inn in Seagoville, Texas, a customer wrote: "…At night there was a pimp and prostitute argument and the front desk allowed this to happen. Very loud until early in the morning. The front desk allows prostitution at night. Told the morning shift about it they didn't care…"[57]

65.    LA QUINTA HOLDINGS, INC. ("LQH"):

a. Defendant LQH owns, supervises, or operates the La Quinta Inn® located at

---

[55] *Residents worry hotel may become den of prostitution*, NY DAILY NEWS (Oct. 30, 2007), https://www.nydailynews.com/new-york/bronx/residents-worry-hotel-den-prostitution-article-1.232160

[56] *One alleged prostitute is a former Marshfield High honor student*, THE PATRIOT LEDGER (Oct. 28, 2008), https://www.patriotledger.com/article/20081028/NEWS/310289571.

[57]    Review of Best Western Executive Inn, Seagoville, TX (Mar. 23, 2016), *available at* https://www.tripadvisor.com/ShowUserReviews-g56648-d73227-r357822545-Best_Western_Executive_Inn-Seagoville_Texas.html.

4850 S. Cleveland Avenue Fort Myers, Florida 33907. LQH failed to implement and enforce any of its own policy or policies and protect Plaintiff C.T. from being sex trafficked.[58]

b. Defendant LQH had actual knowledge of sex trafficking occurring on its branded hotel properties because LQH and La Quinta knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. LQH and La Quinta allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the La Quinta. LQH and La Quinta facilitated the trafficking through its practices, policies, and procedures. LQH and La Quinta failed to take appropriate action to prevent the trafficking of individuals for sex so that LQH and La Quinta continue to profit from the business that trafficking brings, including business from out-of-state.

c. Defendant LQH had constructive knowledge of sex trafficking occurring on its branded hotel properties because LQH and La Quinta knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. LQH and La Quinta allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the La Quinta. LQH and La Quinta facilitated the trafficking

---

[58]    The La Quinta Inn brand was acquired by Wyndham in March 2019.

through its practices, policies, and procedures. LQH and La Quinta failed to take appropriate action to prevent the trafficking of individuals for sex so that LQH and La Quinta continue to profit from the business that trafficking brings, including business from out-of-state.

d. LQH knew or should have known that the La Quinta Inn® hotel where Plaintiff C.T. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff C.T. was trafficked.

e. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant LQH has repeatedly failed to stop these actions.

f. Defendant LQH exercised control over La Quinta Inn® hotels by:

    i. distributing information to assist employees in identifying human trafficking;

    ii. providing a process for escalating human trafficking concerns within the organization;

    iii. requiring employees to attend training related to human trafficking;

    iv. providing new hire orientation on human rights and corporate responsibility;

    v. providing training and education to La Quinta Inn® branded hotels through webinars, seminars, conferences, and online portals;

    vi. developing and holding ongoing training sessions on human trafficking; or

41

    vii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

g.  LQH was in an agency relationship with La Quinta Inn® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant LQH's exercise of an ongoing and systemic right of control over La Quinta Inn® hotels by Defendant LQH's operations, including the means and methods of how La Quinta Inn® branded hotels conducted daily business through one or more of the following actions:

    i.  hosting online bookings on Defendant LQH's domain;

    ii.  requiring La Quinta Inn®  branded hotels to use Defendant LQH's customer rewards program;

    iii.  setting employee wages;

    iv.  making employment decisions;

    v.  advertising for employment;

    vi.  sharing profits;

    vii.  standardized training methods for employees;

    viii.  building and maintaining the facility in a manner specified by the owner;

    ix.  standardized or strict rules of operation;

    x.  regular inspection of the facility and operation by owner;

    xi.  fixing prices; or

    xii.  other actions that deprive La Quinta Inn® branded hotels of independence in business operations.

h. An apparent agency also exists between Defendant LQH and La Quinta Inn® hotels. Defendant LQH held out La Quinta Inn® branded hotels to the public as possessing authority to act on its behalf.

i. Given Defendant LQH's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including La Quinta Inn® branded hotels, Defendant LQH breached its duties in the following ways:

    i. did not adequately distribute information to assist employees in identifying human trafficking;

    ii. failed to provide a process for escalating human trafficking concerns within the organization;

    iii. failed to mandate managers, employees, or owners attend training related to human trafficking;

    iv. failed to provide new hire orientation on human rights and corporate responsibility;

    v. failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    vi. failed to develop and hold or require ongoing training sessions on human trafficking; or

    vii. failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

j. For years, Defendant LQH has demonstrated actual and/or constructive

knowledge of the rampant culture of sex trafficking which tragically occurs on its La Quinta Inn® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff C.T. at La Quinta Inn® hotels that forms the basis of this complaint.

i.  In August 2008, a woman was arrested for running an escort service out of various hotels in Bergen, Passaic, Hudson, and Essex counties, which included the La Quinta Hotel on Route 46.[59]

ii. In July 2009, a Cambridge pimp whose mom was a well-known political staple in the city was arrested after police found a woman set up in a prostitution scheme in the La Quinta Inn in Somerville.[60]

iii. In November 2013, the La Quinta Inn in San Diego, California was sued by the City Attorney's Office for its history of illegal activity. Police had made several prostitution arrests in a short span of time and often found several prostitutes on site at the hotel. In reaching a settlement with the property and franchise owners, the hotel agreed to toughen its policies, add cameras, and check identification of guests and visitors.[61]

iv. In February 2016, a La Quinta Inn owner was arrested during a prostitution bust. One woman was arrested for prostitution and the

---

[59] *Paterson woman charged with running local prostitution service*, THE PROGRESS (Aug. 15, 2008), available at https://www.newjerseyhills.com/the_progress/news/paterson-woman-charged-with-running-local-prostitution-service/article_bb36894b-ee4c-5bdf-9b5c-e1873080b1f9.html.

[60] *Former state rep's son accused of being a pimp; says he was 'helping' hooker*, METROWEST DAILY NEWS (Jul. 1, 2009), https://www.metrowestdailynews.com/article/20090701/News/307019964

[61] *City atty.: Hookers worked out of La Quinta Inn*, THE SAN DIEGO UNION-TRIBUNE (Nov. 21, 2013), https://www.sandiegouniontribune.com/sdut-la-quinta-inn-prostitution-rancho-penasquitos-2013nov21-story.html.

owner was arrested for tipping the woman off when police arrived. Police also said the owner knew that the woman was using the room at the La Quinta to solicit prostitution.[62]

v.  Additionally, Defendant LQH has been aware of sex trafficking occurring on La Quinta Inn brand properties through publicly available online review websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on La Quinta Inn brand properties and Defendant LQH's inattentiveness, for example:

- Regarding a January 2009 stay at a La Quinta Inn in Elmsford, New York, a customer wrote: "Also to make my trip exciting was the hooker that keeps going to the back door to meet her [trick]. Blondie has quit a business going on I smoke so I would go outside to have a [cigarette] and a few times I was approached by her trick and would have to tell him she was at the door waiting. It was very uncomfortable. Even my pregnant daughter was approached. By our third night a new hooker had come to stay."[63]

- Regarding a November 2013 stay at a La Quinta Inn in Milwaukee, Wisconsin, a customer wrote: "…The first

---

[62] *La Quinta Inn Hotel Owner Arrested in Prostitution Bust*, SPECTRUM NEWS (Feb. 27, 2016), https://spectrumlocalnews.com/nys/buffalo/news/2016/02/27/hotel-owner-arrested-in-prostitution-bust.
[63] Review of La Quinta Inn & Suites by Wyndham White Plains – Elmsford, Elmsford, New York (Jan. 7, 2009), available at https://time.com/3525640/sex-trafficking-victim-prostitution-hotel/.

thing I noticed when we pulled up was the obvious hooker outside… This hotel is SUPER gross. It's just a hang out for prostitutes and drug users. The staff is obviously either partaking, or allowing it to happen. Either way, this hotel management needs to think about hiring new people who won't turn their hotel into a sleazy, disgusting mess…"[64]

- Regarding an August of 2014 stay at the La Quinta Inn in Fort Myers, Florida, a customer wrote: "There was very obvious prostitution going on while we were there. I spoke to the lady at the front desk about it and she said that they had began a "NO CASH" policy back in September of last year and it had helped with the drug dealings and prostitution a lot, but they couldn't completely eliminate it."[65]

- Regarding a March 2016 stay at a La Quinta Inn in Sacramento, California, a customer wrote: "Unfortunately, this motel is used by many people who use drugs and many of the purchases occurred in the back parking lot. There were also prostitutes and their guests. If

---

[64] Review of La Quinta Inn by Wyndham Milwaukee Glendale Hampton Ave (Dec. 3, 2013), *available a*t https://www.tripadvisor.com/ShowUserReviews-g59917-d240573-r186657751-La_Quinta_Inn_by_Wyndham_Milwaukee_Glendale_Hampton_Ave-Glendale_Wisconsin.html.

[65] Review of La Quinta Inn by Wyndham Fort Myers Central (Aug. 4, 2014), *available at* https://www.tripadvisor.com/ShowUserReviews-g34230-d87561-r220389527-La_Quinta_Inn_by_Wyndham_Fort_Myers_Central-Fort_Myers_Florida.html.

you're not into this I recommend you choose another motel."[66]

66.    RED ROOF INNS, INC.  ("RRI"):

a.    Defendant RRI owns, supervises, or operates the Red Roof Inn® located at 13000 North Cleveland Avenue Fort Myers, Florida 33903. RRI failed to implement and enforce any of their own policy or policies and protect Plaintiff C.T. from being sex trafficked.

b.    Defendant RRI had actual knowledge of sex trafficking occurring on its branded hotel properties because RRI and Red Roof Inn knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. RRI and Red Roof Inn allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Red Roof Inn. RRI and Red Roof Inn facilitated the trafficking through its practices, policies, and procedures. RRI and Red Roof Inn failed to take appropriate action to prevent the trafficking of individuals for sex so that RRI and Red Roof Inn continue to profit from the business that trafficking brings, including business from out-of-state.

c.    RRI knew or should have known that the Red Roof Inn® hotel where Plaintiff C.T. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when

---

[66] Review of La Quinta Inn by Wyndham Sacramento North (Mar. 8, 2016), *available at* https://www.tripadvisor.com/ShowUserReviews-g32999-d79713-r354487204-La_Quinta_Inn_by_Wyndham_Sacramento_North-Sacramento_California.html.

Plaintiff C.T. was trafficked.

d.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant RRI has repeatedly failed to stop these actions.

e.  Defendant RRI exercised control over Red Roof Inn® hotels by:

    i.  distributing information to assist employees in identifying human trafficking;

    ii.  providing a process for escalating human trafficking concerns within the organization;

    iii.  requiring employees to attend training related to human trafficking;

    iv.  providing new hire orientation on human rights and corporate responsibility;

    v.  providing training and education to Red Roof Inn® branded hotels through webinars, seminars, conferences, and online portals;

    vi.  developing and holding ongoing training sessions on human trafficking; or

    vii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

f.  RRI is in an agency relationship with Red Roof Inn® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant RRI's exercise of an ongoing and systemic right of control over Red Roof Inn® hotels by Defendant RRI's operations, including the means and methods of how Red Roof Inn® branded hotels conducted daily

business through one or more of the following actions:

    i.  hosting online bookings on Defendant RRI's domain;

    ii.  requiring Red Roof Inn® branded hotels to use Defendant RRI's customer rewards program;

    iii.  setting employee wages;

    iv.  making employment decisions;

    v.  advertising for employment;

    vi.  sharing profits;

    vii.  standardized training methods for employees;

    viii.  building and maintaining the facility in a manner specified by the owner;

    ix.  standardized or strict rules of operation;

    x.  regular inspection of the facility and operation by owner;

    xi.  fixing prices; or

    xii.  other actions that deprive Red Roof Inn® branded hotels of independence in business operations.

g.  An apparent agency also exists between Defendant RRI and Red Roof Inn® hotels. Defendant RRI held out Red Roof Inn® branded hotels to the public as possessing authority to act on its behalf.

h.  Given Defendant RRI's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Red Roof Inn® branded hotels, Defendant RRI breached its duties in the following ways:

    i.  did not adequately distribute information to assist employees in

identifying human trafficking;

ii. failed to provide a process for escalating human trafficking concerns within the organization;

iii. failed to mandate managers, employees, or owners attend training related to human trafficking;

iv. failed to provide new hire orientation on human rights and corporate responsibility;

v. failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi. failed to develop and hold or require ongoing training sessions on human trafficking; or

vii. failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

i. For years, Defendant RRI has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Red Roof Inn® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff C.T. at Red Roof Inn® hotels that forms the basis of this complaint.

i. In February 2007, ten (10) arrests were made at the Red Roof Inn on Route 46 in which an undercover operation busted seven women for prostitution, two men for soliciting, and one man for promoting

prostitution.[67]

ii. In May 2009, undercover deputies set up stings at a Red Roof Inn in Naples, Florida in response to four separate prostitution advertisements on Craigslist.com.[68]

iii. In October 2010, a man was arrested after meeting a woman at the Red Roof Inn, impersonating an officer, restraining her with zip ties, and proceeding to have sex with her.[69]

iv. Additionally, Defendant RRI has been aware of sex trafficking occurring on Red Roof Inn brand properties through publicly available online review websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Red Roof Inn brand properties and Defendant RRI's inattentiveness, for example:

- Regarding a March 2008 stay at a Red Roof Inn in Phoenix, Arizona, a customer wrote a review titled, "Watch out for the Hookers" and further explained, "We stayed there for a tournament and there were lots of players there, and there were also hookers looking for some action."[70]

---

[67] *Police in Parsippany worry town is becoming hot spot for prostitution*, NEWS 12 NEW JERSEY (Feb. 9, 2007), http://newjersey.news12.com/story/34879720/police-in-parsippany-worry-town-is-becoming-hot-spot-for-prostitution.

[68] *Sex ads: 4 women busted in Collier Internet prostitution sting*, NAPLES DAILY NEWS (May 14, 2009), http://archive.naplesnews.com/news/crime/sex-ads-4-women-busted-in-collier-internet-prostitution-sting-ep-398191823-343984242.html.

[69] *Police impersonator charged with prostitution, other crimes*, WAVE 3 NEWS (Oct. 21, 2011), https://www.wave3.com/story/15745127/police-impersonator-charged-with-prostitution-other-crimes/.

[70] Review of Red Roof Plus+ Phoenix West, Phoenix, Arizona (Mar. 19, 2008), available at

- Regarding a July 2013 stay at a Red Roof Inn in Atlanta, Georgia, a customer wrote: "There were prostitutes at a couple doors too. Around midnight we heard loud yelling and looked out our window. Seven (yes seven!) cop cars were directly in front of our room and were arresting someone as a prostitute stood 5 feet from our window…"[71]

- Regarding an August 2013 stay at a Red Roof Inn in Tulsa, Oklahoma, a customer wrote: "…at night there are prostitutes running around the back where apparently their pimp [l]ives… and the staff is aware of this… I saw the maintenance man actually pick up a hooker…"[72]

### D.    THE SEX TRAFFICKING OF C.T.

67.    At the age of 19, C.T. met her traffickers. Through the use of drugs, violence, and threats, C.T. was held captive and sold for sex by her traffickers at Defendants' hotels.

68.    From approximately 2008 to 2010, the Plaintiff was repeatedly trafficked for sex at Days Inn, Travelodge, Best Western, La Quinta, and Red Roof Inn properties in the Fort Myers, Florida area.

69.    C.T. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants'

---

https://www.tripadvisor.com/ShowUserReviews-g31310-d224757-r14398624-Red_Roof_Plus_Phoenix_West-Phoenix_Arizona.html.
[71]    Review of Red Roof Inn Atlanta – Smyrna/Ballpark (Jul. 7, 2013), *available at* https://www.tripadvisor.com/ShowUserReviews-g35266-d86803-r166599440-Red_Roof_Inn_Atlanta_Smyrna_Ballpark-Smyrna_Georgia.html
[72]    Review of Red Roof Inn Tulsa Airport (Aug. 3, 2013), *available at* https://www.tripadvisor.com/ShowUserReviews-g51697-d101901-r170630924-Red_Roof_Inn_Tulsa_Airport-Tulsa_Oklahoma.html.

hotels from 2008 to 2010.

70.   C.T. was advertised for sale on craigslist's website from 2008 to 2010.

71.   C.T. was repeatedly sold and purchased for commercial sex acts as a victim of sex trafficking. She was sold to at least 12 "johns" per night.

72.   C.T.'s traffickers purchased the rooms.

73.   During the time C.T. was trafficked, she was constantly shuffled from hotel to hotel. The Plaintiff encountered the same hotel staff over the course of the time she was trafficked for sex at the Defendants' hotel properties, and the hotel staff would have observed visible physical changes, such as bruising, to the Plaintiff's appearance.

74.   While at the Defendant Hotels' properties, C.T. was watched and monitored by her traffickers to ensure she did not leave. Someone was with C.T. at all times of the day. Each buyer entering Defendant Hotels' properties was a non-paying guest and left shortly after he arrived. The foot traffic to the rooms was constant and voluminous.

75.   Despite desperate pleas and screams for help, near escape despite the hotels unwillingness to assist, and after being beaten or choked at the Defendants' hotel properties, hotel staff ignored C.T. and did nothing to prevent the ongoing torture she endured while she was regularly trafficked for sex at Defendants' hotel properties.

76.   On several occasions, C.T.'s traffickers injured her so badly that it would have been noticeable to the public. When police finally rescued her, she was under 100 pounds.

77.   Despite obvious signs of human trafficking (physical deterioration, no eye contact, and duration of stay) and indicators of commercial sex activity (bottles of lubricants, boxes of condoms, used condoms in the trash, excessive requests for towels and linens, cash payments), Defendant Hotels failed to recognize or report Plaintiff C.T.'s trafficking. The

Defendants harbored or otherwise facilitated a sex trafficking venture on their hotel properties and accordingly, financially benefited from the sex trafficking the Plaintiff suffered. Furthermore, the Defendants failed to prevent her continued victimization.

78.    Prior to, during, and following the incidents described herein, the Defendants had actual and/or constructive notice of drug dealing, prostitution, violence, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. The Defendants failed to take any actions to curtail these activities.

79.    Had the Defendants been paying attention to the activities being conducted at their hotels and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of C.T.

80.    The impact of being starved, choked, beaten, and sex trafficked at the Defendants' hotel properties has forever emotionally and physically injured C.T. who, despite the many years since her escape suffers immensely as a result of the horrors inflicted upon her at the Defendants' hotel properties.

### E.  THE DEFENDANTS FACILITATED THE TRAFFICKING OF C.T.

81.    Wyndham, LQH, BWI, and RRI ("Defendant Hotels") profited from the sex trafficking of C.T. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. The Defendants leased rooms to C.T.'s traffickers, when they knew, or should have known, that he was using their room to imprison C.T., physically assault her, and subject her to repeated exploitation as he forced her into sexual servitude.

82.    Defendant Hotels knew, or should have known, that C.T. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because

C.T.'s trafficker frequented the Defendants' hotels.

83.  Defendant Hotels knew, or should have known, that C.T. was being trafficked because C.T. was arrested on property grounds, constantly entertained traffic to appease her traffickers' daily quotas, and her traffickers would help check her in then not proceed to the room; behavior that indicated they were using the Defendants' hotels for his illegal sex trafficking venture.

84.  Defendant Hotels actively participated in this illegal endeavor by knowingly or negligently providing lodging to C.T.'s trafficker in which to harbor C.T. while he was trafficking her.

85.  Defendant Hotels profited from the sex trafficking of C.T. and knowingly or negligently aided and participated with C.T.'s trafficker in his criminal venture. The Defendants took no action as C.T. repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and exhibiting signs of malnourishment, and often displaying prominent bruising all over her person.

86.  Defendant Hotels actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from C.T. in which to harbor C.T. while she was being trafficked.

87.  The Defendant Hotels all had the opportunity to stop C.T.'s trafficker and offenders like him from victimizing C.T. and others like her. Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

88.  The Defendant Hotels all financially benefited from the sex trafficking of C.T., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

89.    Defendant Hotels enjoy the steady stream of income that sex traffickers bring to their budget level hotel brands, such as the Days Inn, Best Western, Travelodge, La Quinta Inn, and Red Roof Inn.

90.    Defendant Hotels financially benefit from their ongoing reputation for  privacy, discretion, and the facilitation of commercial sex.

91.    Defendant Hotels failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

92.    Defendant Hotels maintained their deficiencies to maximize profits by:

    a.    Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

    b.    Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    c.    Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

93.    As a direct and proximate result of these egregious practices on the part of the Defendant Hotels, C.T. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A. COUNT ONE – 18 U.S.C §1595 ("TVPRA")

94.    The Plaintiff C.T. incorporates each foregoing allegation.

95.    C.T. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

96.    The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of the TVPRA. At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of C.T. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

97.    The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefitted from the trafficking of C.T. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of C.T.'s injuries and damages.

98.    C.T. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties.

## **PRAYER FOR RELIEF**

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a.  All available compensatory damages for the described losses with respect to each cause of action;

b.  past and future medical expenses, as well as the costs associated with past and future life care;

c.  past and future lost wages and loss of earning capacity;

d.   past and future emotional distress;

e.  consequential and/or special damages;

f.  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.  disgorgement of profits obtained through unjust enrichment;

h.  restitution;

i.  punitive damages with respect to each cause of action;

j.  reasonable and recoverable attorneys' fees;

k.  costs of this action; and

l.  pre-judgment and all other interest recoverable

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award

damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

## **JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.

Dated: December 9, 2019                                **RESPECTFULLY SUBMITTED,**

/s/ Steven C. Babin, Jr.
Steven C. Babin, Jr. (0093584)
Babin Law, LLC
1320 Dublin Road, #100
Columbus, Ohio 43215
T: 614-384-7035
E: steven.babin@babinlaws.com

/s/ Kimberly Lambert Adams
Kimberly Lambert Adams (*pro hac vice*
admission forthcoming)
FL Bar No. 0014479
Levin, Papantonio, Thomas, Mitchell,
Rafferty & Proctor, P.A.
316 S. Baylen St. Suite 600
Pensacola, FL 32502
T: 850.435.7056
F: 850.436.6056
E: kadams@levinlaw.com

***Trial Attorneys for Plaintiff***