|  |  |  |
|---|---|---|
| C.T., an individual, | ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. 19-cv-5384-ALM-EPD |
| v. | ) ) | |
| RED ROOF INNS, INC.; | ) ) | Chief Judge Algenon L. Marbley Magistrate Judge Elizabeth P. Deavers |
| Serve its Registered Agent: | ) | |
| Corporation Service Company | ) | |
| 50 West Broad Street, Suite 1330 | ) | |
| Columbus, Ohio 43215 | ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| WYNDHAM HOTELS & RESORTS, | ) | |
| INC.; | ) ) | |
| Serve its Registered Agent: | ) | |
| Corporate Creations Network, Inc. | ) | |
| 3411 Silverside Road | ) | |
| Tatnall Building – Suite 104 | ) | |
| Wilmington, Delaware 19810 | ) ) | |
| | ) | |
| BEST WESTERN INTERNATIONAL, | ) | |
| INC.; | ) ) | |
| Serve its Registered Agent: | ) | |
| The Prentice-Hall Corporation System, | ) | |
| Inc. | ) | |
| 50 West Broad Street, Suite 1330 | ) | |
| Columbus, Ohio 43215 | ) ) | |
| | ) | |
| LA QUINTA HOLDINGS, INC.; | ) ) | |
| Serve its Registered Agent: | ) | |

1

Corporate Creations Network, Inc. )
3411 Silverside Road )
Tatnall Building – Suite 104 )
Wilmington, Delaware 19810 )
 )
 )
LA QUINTA FRANCHISING LLC; )
Serve its Registered Agent: )
Corporate Creations Network, Inc. )
119 E. Court Street )
Cincinnati, Ohio 45202 )
 )
LA QUINTA MANAGEMENT LLC; )
Serve its Registered Agent: )
Corporate Creations Network, Inc. )
119 E. Court Street )
Cincinnati, Ohio 45202 )
 )
AMERICAN HOTEL AND LODGING )
ASSOCIATION; )
1250 Eye Street NW, Suite 1100 )
Washington, D.C. 20005 )
 )
 )
OHIO HOTEL AND LODGING )
ASSOCIATION, )
175 S. Third Street, Suite 170 )
Columbus, Ohio 43215 )
     Defendants. )

## FIRST AMENDED COMPLAINT

COMES NOW the Plaintiff C.T., by and through the undersigned counsel, and respectfully submits her first amended complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have brazenly operated in and out of Defendants' hotel properties throughout this country while Defendants continue to earn a profit at the expense of human life, human rights, and human dignity.

2. Red Roof Inn, Inc. (hereinafter "RRI"), Wyndham Hotels & Resorts, Inc. (hereinafter "Wyndham"), Best Western International, Inc. (hereinafter "BWI"), La Quinta Holdings, Inc. (hereinafter "LQH"), La Quinta Franchising, LLC (hereinafter "LQF"), and La Quinta Management LLC (hereinafter "LQM")[1] knew, and should have known, for more than a decade that sex trafficking repeatedly occurred and continues to occur under their brand flag.

3. Rather than taking timely and effective measures to thwart this epidemic, Defendants have instead turned a blind eye to evidence they knew or should have known were signs of sex trafficking in their hotels, enjoying the benefits derived from trafficking, including but not limited to room rental fees and branding.

4. This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials C.T., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

---

[1] Collectively, Wyndham, BWI, LQH, and RRI may be referred to as "Defendant Hotels" or "Hotel Defendants." Separately, La Quinta Holdings, Inc., La Quinta Franchising, LLC, and La Quinta Management, LLC may collectively be referred to as the "La Quinta Defendants."

5. Plaintiff C.T. is a survivor of sex trafficking. At the age of 19, Plaintiff was sold via commercial sex transactions at Defendants' hotel properties through force, fraud, and coercion. C.T. was preyed upon by traffickers who bought, sold, and required her to subdue herself sexually to strangers. As she endured years of brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at the Defendants' hotel properties, Defendants turned a blind eye to continue to profit from this ongoing illegal sex venture.

6. The Plaintiff now brings this action for damages against the Defendants listed herein. Each of the Defendants, in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a). Moreover, Defendants conspired with each other to violate 18 U.S.C. § 1595.

7. C.T. was advertised on www.craigslist.com and other websites, physically tortured, and sexually exploited by force at Defendants' hotels, including the Days Inn, La Quinta Inn, Travelodge, Best Western Inn (BWI), and Red Roof Inn (RRI).

8. As a direct and proximate result of Defendants Wyndham, BWI, RRI, and La Quinta's refusals to provide adequate remedies and safety measures against human trafficking on their hotel properties, C.T. was sex trafficked, sexually exploited, and victimized repeatedly at Days Inn, Best Western Inn, Travelodge, La Quinta, and Red Roof Inn brand hotels.

9. The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, Conspiracy to Violate the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, and Civil Conspiracy against the

Defendants who enabled, harbored, held, facilitated, or otherwise financially benefited, or any combination of the foregoing, from a sex trafficking venture in which C.T. was trafficked for sex, sexually exploited, and victimized in violation of the TVPRA.

## PARTIES

10. Plaintiff C.T. is a natural person who is a resident and citizen of Florida.

   a. Plaintiff C.T. was 19 years old when she was first sold for the purposes of commercial sex. Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14).

   b. Due to the sensitive and intimate nature of the issues, Plaintiff C.T. requests this Court to grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit and thereafter.[2]

   c. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[4] For good

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3] Fed. R. Civ. P. 10(a).

[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g.,M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir. 1981); *see also Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[5]

   d. Here, pseudonym status is warranted because this litigation will involve the disclosure of stigmatizing sexual information. Plaintiff fears stigma from her family, friends, employer, and community if her true identity was revealed in the public record.

   e. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[6]

   f. Moreover, Defendants will not be prejudiced. Plaintiff simply seeks redaction of Plaintiff's personally identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identities in a manner that will compromise her safety, personal life, or future employment prospects.

11. Defendant Red Roof Inns, Inc. ("RRI") is a large hotel brand with over 550 properties worldwide.[7] It is an Ohio corporation and can be served with service of process through its registered agent Corporation Service Company, 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

   a. Red Roof Inn has its principal place of business in New Albany, Ohio. Defendant RRI regularly conducts business in the state of Ohio.

---

[5] Fed. R. Civ. P. 26(c).
[6] *Does I thru XXIII v. Advanced Textile Corp.,* supra n.2 at 1068 (the court joined its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).
[7] RedRoof, Media Center, available at https://www.redroof.com/media/.

b. The claims in the lawsuit arise, in part, from RRI's conspiracy with other defendants related to business and contracts that took place in Ohio as well as other states.

c. Red Roof Inn® is a RRI brand property. RRI owns, supervisors, and/or operates the Red Roof Inn® located at 13000 North Cleveland Avenue Fort Myers, Florida 33903.

d. Defendant RRI and the Red Roof Inn® are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Red Roof Inn® hotel where the Plaintiff was trafficked for sex. Defendant RRI and the Red Roof Inn® each share the common policies and practices complained of herein.

e. Defendant RRI and the Red Roof Inn® jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

f. RRI is considered an employer of the employees at Red Roof Inn® under federal labor regulations.

g. As an integrated enterprise and or joint employer, Defendant RRI and the Red Roof Inn® are separately and jointly responsible for compliance with all applicable laws.

h. As an integrated enterprise and or joint employer, Defendant RRI and the Red Roof Inn® are jointly and severally liable for any damages caused by employees.

i. As hotel operator, Defendant RRI controls the training and human

trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties including the Red Roof Inn® hotel where C.T. was trafficked.

j. Defendant RRI maintains data in server logs and internet files that could be used to help prevent human trafficking, but it fails to use this data for the prevention of human trafficking.

k. Through its relationship with the Red Roof Inn® hotel where C.T. was trafficked and the perpetrator who trafficked C.T. at the Red Roof Inn® hotel, Defendant RRI knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

l. RRI benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked

12. Defendant Wyndham Hotels and Resorts, Inc. ("Wyndham") is one of the largest hotel brands in the world with nearly 9,000 branded properties in more than eighty (80) countries. It is a Delaware corporation and can be served by its registered agent Corporate Creations Network, Inc., 3411 Silverside Road, Tatnall Building Suite 104, Wilmington, Delaware 19810.

a. Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation. Defendant Wyndham Hotels and Resorts, Inc. retains successor liability for wrongful acts of its predecessor Wyndham Worldwide Corporation.

i. Defendant Wyndham owns, supervises, operates, and/or has its

8

brand on 163 hotels within the state of Ohio.[8]

ii. The claims in the lawsuit arise, in part, from Wyndham's conspiracy with other defendants (described in further detail below) related to business and contracts that took place in Ohio as well as other states.

iii. Defendant Wyndham conducts and operates business throughout the state of Ohio. Defendant Wyndham further engages in business associations and is regularly in contact with Defendant RRI, which is headquartered in Ohio.

iv. Wyndham is subject to the jurisdiction of this Court because it regularly transacts business in Ohio, operates dozens of hotels in Ohio, contracts to supply services in Ohio, caused indivisible injuries to Plaintiff, and profited from an illegal sex trafficking venture at its hotels.

v. Defendant Wyndham controls the training, education requirements, online access policies, and human trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties such as the Days Inn by Wyndham and Travelodge by Wyndham, including those in Ohio.

vi. Defendant Wyndham is considered an employer under federal labor regulations.

vii. Defendant Wyndham maintains data in server logs and internet

---

[8] *See* https://www.wyndhamhotels.com/locations.

files that could be used to help prevent human trafficking, but it fails to use this data for the prevention of human trafficking.

b. In 2006, Days Inn® by Wyndham ("Days Inn®") properties were acquired by Wyndham Hotels and Resorts, Inc., who currently owns, supervises, and/or operates the Days Inn® located at 11435 S. Cleveland Avenue Fort Myers, Florida 33907.

    i. Defendant Wyndham and the Days Inn® by Wyndham are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Days Inn® by Wyndham Defendant hotel where the Plaintiff was trafficked for sex. Defendant Wyndham and the Days Inn® by Wyndham each share the common policies and practices complained of herein.

    ii. Defendant Wyndham and the Days Inn® jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

    iii. Defendant Wyndham and the Days Inn® are considered employers of the Days Inn employees under federal labor regulations.

    iv. As an integrated enterprise and or joint employer, Defendant Wyndham and the Days Inn® are separately and jointly responsible for compliance with all applicable laws.

    v. As an integrated enterprise and or joint employer, Defendant Wyndham and the Days Inn® are jointly and severally liable for any damages caused by employees.

vi. As a hotel operator, Defendant Wyndham controls the training and human trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties including the Days Inn® hotel where C.T. was trafficked. Through its relationship with the staff at the Days Inn® where C.T. was trafficked and the perpetrator who trafficked C.T. at Days Inn® hotels, Defendant Wyndham knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

vii. Days Inn® contracts to supply goods and services in the state of Ohio.

viii. The claims in the lawsuit arise, in part, from Days Inn®'s conspiracy with other defendants (described in further detail below) related to business and contracts that took place in Ohio as well as other states.

ix. Wyndham benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

c. In 2006, Travelodge® ("Travelodge®") properties were acquired by Wyndham Hotels and Resorts, Inc. ("Wyndham"), who currently owns, supervises, and/or operates the Travelodge® located at 4760 S. Cleveland Avenue Fort Myers, Florida 33907.

i. Defendant Wyndham and the Travelodge® by Wyndham are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Travelodge® by Wyndham Defendant hotel where the Plaintiff was trafficked for sex. Defendant Wyndham and the Travelodge® by Wyndham each share the common policies and practices complained of herein.

ii. Defendant Wyndham and the Travelodge® jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

iii. As an integrated enterprise and or joint employer, Defendant Wyndham and the Travelodge® are separately and jointly responsible for compliance with all applicable laws.

iv. As an integrated enterprise and or joint employer, Defendant Wyndham and the Travelodge® are jointly and severally liable for any damages caused by employees.

v. Defendant Wyndham and the Travelodge® are considered employers under federal labor regulations.

vi. As a hotel operator, Defendant Wyndham controls the training and human trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties including the Travelodge hotel where C.T. was trafficked.

vii. Through its relationship with the staff at the Travelodge® where

12

C.T. was trafficked and the perpetrator who trafficked C.T. at Travelodge® hotels, Defendant Wyndham knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

viii.     Travelodge® contracts to supply goods and services in the state of Ohio.

ix. The claims in the lawsuit arise, in part, from Travelodge®'s conspiracy with other defendants (described in further detail below) related to business and contracts that took place in Ohio as well as other states.

x. Wyndham benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

13.   Defendant Best Western International, Inc. ("BWI") is one of the largest hotel brands in the world. It is a global network of more than 4,200 hotels. It can be served by its registered agent The Prentice-Hall Corporation System, Inc., 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

a. In the state of Ohio, Defendant BWI owns, supervises, operates, and/or has it brand on approximately 44 hotels, including 10 hotels directly in Columbus, Ohio.[9]

b. Defendant BWI conducts and operates business throughout the state of

---

[9] *See* https://www.bestwestern.com/en_US/hotels/destinations/united-states/great-lakes/ohio html; *see also* https://www.bestwestern.com/en_US/hotels/destinations/united-states/great-lakes/ohio/central-ohio/columbus.html.

Ohio. Best Western® further engages as a member in business trade associations and is regularly in contact with Defendant RRI, which is headquartered in Ohio.

c. BWI is subject to the jurisdiction of this Court because it regularly transacts business in Ohio, operates dozens of hotels in Ohio, contracts to supply services in Ohio, caused indivisible injuries to Plaintiff, and profited from an illegal sex trafficking venture at its hotels.

d. The claims in the lawsuit arise, in part, from BWI's conspiracy with other defendants (described in further detail below) related to business and contracts that took place in Ohio as well as other states.

e. Best Western® is a BWI brand property. BWI owns, supervises, and/or operates the Best Western® located at 4400 Ford Street Fort Myers, Florida 33916.

f. Defendant BWI and the Best Western® are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Best Western® hotel where the Plaintiff was trafficked for sex. Defendant BWI and the Best Western® each share the common policies and practices complained of herein.

g. Defendant BWI and the Best Western® jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

h. As an integrated enterprise and or joint employer, Defendant BWI and the Best Western® are separately and jointly responsible for compliance with

14

all applicable laws.

i. As an integrated enterprise and or joint employer, Defendant BWI and the Best Western® are jointly and severally liable for any damages caused by employees.

j. Defendant BWI and the Best Western® are considered employers under federal labor regulations.

k. As hotel operator, Defendant BWI controls the training and human trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties including the Best Western® hotel where C.T. was trafficked.

l. Defendant BWI maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with BWI brand standards and all local, state, and federal laws.

m. Defendant BWI maintains data in server logs and internet files that could be used to help prevent human trafficking, but it fails to use this data for the prevention of human trafficking.

n. Through its relationship with the Best Western® hotel where C.T. was trafficked and the perpetrator who trafficked C.T. at the Best Western® hotel, Defendant BWI knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

o. BWI benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

14. Defendant La Quinta Holdings, Inc. ("LQH") is a large hotel brand. It is a Texas corporation and can be served by its registered agent, Corporate Creations Network Inc., at 3411 Silverside Road – Tatnall Building, Suite 104, Wilmington, Delaware 19810.

    a. Defendant La Quinta Franchising, LLC ("LQF") is a wholly owned subsidiary of La Quinta Holdings, Inc. ("LQH"). It is a Texas corporation and can be served by its registered agent Corporate Creations Network, Inc., 119 E. Court Street, Cincinnati, Ohio 45202.

    b. Defendant La Quinta Management, LLC ("LQM") is a wholly owned subsidiary of La Quinta Holdings, Inc. ("LQH"). It is a Texas corporation with an Ohio branch located at 120 Standor Avenue, Mansfield, Ohio 44906 and can be served by its registered agent Corporate Creations Network, Inc., 119 E. Court Street, Cincinnati, Ohio 45202.

    c. LQH, together with its fully owned subsidiaries, La Quinta Franchising, LLC ("LQF") and La Quinta Management, LLC ("LQM") (hereinafter collectively the "La Quinta Defendants") conducts and operates business throughout the state of Ohio. The La Quinta Defendants further engage in business associations and is regularly in contact with Defendant Red Roof, which is headquartered in Ohio.

    d. LQH is subject to the jurisdiction of this Court because it regularly transacts business in Ohio, operates dozens of hotels in Ohio, contracts to supply services in Ohio, caused indivisible injuries to Plaintiff, and

profited from an illegal sex trafficking venture at its hotels.

e. La Quinta Inn$_®$ is an LQH brand property. La Quinta Defendants owned, supervised, and/or operated the La Quinta Inn$_®$ located at 4850 S. Cleveland Avenue Fort Myers, Florida 33907.[10]

f. La Quinta Defendants and the La Quinta Inn$_®$ are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the La Quinta Inn$_®$ hotel where the Plaintiff was trafficked for sex. La Quinta Defendants and the La Quinta Inn$_®$ each share the common policies and practices complained of herein.

g. La Quinta Defendants and the La Quinta Inn$_®$ jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

h. As an integrated enterprise and or joint employer, La Quinta Defendants and the La Quinta Inn$_®$ are separately and jointly responsible for compliance with all applicable laws.

i. As an integrated enterprise and or joint employer, La Quinta Defendants and the La Quinta Inn$_®$ are jointly and severally liable for any damages caused by employees.

j. La Quinta Defendants and the La Quinta Inn are considered employers under federal labor regulations.

k. As hotel operators, La Quinta Defendants controls the training and human trafficking or other related policies for its branded properties

---

[10] Upon information and belief, as of May 2018, the La Quinta hotel brand was acquired by Defendant Wyndham. However, during the time that Plaintiff C.T. was trafficked for sex, the La Quinta Inn was owned, managed, supervised, and/or operated by Defendant LQH.

including decisions on implementation and execution of policy for its branded properties including the La Quinta Inn® hotel where C.T. was trafficked.

l. La Quinta Defendants maintains that they consider guest safety and security to be important and requires the hotels in its portfolio to comply with La Quinta brand standards and all local, state, and federal laws.

m. Through its relationship with the La Quinta Inn® hotel where C.T. was trafficked and the perpetrator who trafficked C.T. at the La Quinta Inn® hotel, La Quinta Defendants knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

n. La Quinta Defendants maintain data in server logs and internet files that could be used to help prevent human trafficking, but it fails to use this data for the prevention of human trafficking.

o. La Quinta Defendants benefit financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

15. Defendant American Hotel & Lodging Association ("AHLA") is a corporation organized under the laws of Delaware, with its principal place of business in Secaucus, New Jersey. At all relevant times, upon information and belief, Wyndham, La Quinta, RRI, and BWI have been active members of AHLA. AHLA may be served with process of this Court via service on its registered agent, Incorp. Services, Inc. at 919 North Market Street, Suite 950 Wilmington, Delaware 19801.

18

a. At all relevant times, upon information and belief, AHLA was a national trade association and professional organization representing the hotel industry for the purpose of, and in fact, interacting with and influencing local, state and federal governmental agencies on issues related to, among other things, the human trafficking epidemic. AHLA is the "singular voice representing every segment of the hotel industry including major chains, independent hotels, management companies, REIT's, bed and breakfasts, industry partners, and more."[11] The actions of Defendant AHLA have had repercussions throughout the hotel industry in Ohio, and in all states of the United States. AHLA purposefully avails itself to the state of Ohio and the citizens of Ohio through its advocacy and representation of its Ohio members.

16. Defendant Ohio Hotel Lodging Associations ("OHLA") is a corporation organized under the laws of Ohio, with its principal place of business in Columbus, Ohio. At all relevant times, upon information and belief, Wyndham, La Quinta, RRI, and BWI have been active members of OHLA. OHLA may be served with process of this Court via service on its registered agent, Joseph Thomas Savarise at 175 S. Third Street, Suite 170 Columbus, Ohio 43215.

a. At all relevant times, upon information and belief, OHLA is an Ohio a trade association and professional representing the hotel industry for the purpose of, and in fact, interacting with and influencing local, state and federal governmental agencies on issues related to, among other things,

---

[11] *See* https://www.ahla.com/who-we-are

the human trafficking epidemic. Upon information and belief, OHLA provided and continues to provide advocacy, information, education, and resources to Ohio's hospitality industry in order to promote and grow Ohio's travel economy.[12] The actions of OHLA have had repercussions throughout the hotel industry in Ohio and purposely avails itself to the state of Ohio and the citizens of Ohio. OHLA oversees lodging councils several cities across the state.[13]

17. Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

18. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States.

19. Furthermore, this Honorable Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between Plaintiff and all Defendants. The amount in controversy exceeds $75,000.

20. Venue is proper in this District Court as this District Court is a judicial district where Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. § 1391(b)(3).

21. This Court has general jurisdiction under Ohio's long arm statute.  O.R.C. §

---

[12] *See* http://www.ohiolodging.com/aws/OHLA/pt/sp/home_page
[13] *See* http://www.ohiolodging.com/aws/OHLA/pt/sp/about

2307.382.

22. Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

23. Defendants have consensually submitted to the jurisdiction of Ohio and have purposefully availed themselves of the privilege of conducting acts in Ohio through their dominion and control over their respective brands with brand subsidiaries, brand property subsidiaries, and operating hotels, and day-to-day operation of the hotels, and thus, invoking the benefits and protections of the laws in Ohio; Ohio has an equally strong interest in protecting and assuring the safety of persons within its State.

24. Defendants have consensually submitted to the jurisdiction of Ohio and have purposefully availed themselves of the privilege of conducting acts in Ohio which is imputed through the conduct of brand subsidiaries, brand property subsidiaries, and operating hotels as a result of Defendants' control over its brand, thus, invoking the benefits and protections of the laws in Ohio; Ohio has an equally strong interest in protecting and assuring the safety of persons within its State; and Ohio has an interest in ensuring conspiracies regarding human trafficking do not occur in its state and that corporations headquartered in its state do not engage in such conspiracies.

25. Ohio is an acknowledged epicenter of human trafficking, and serves as a central ground where Defendants conspired together to fail to implement measures legally mandated to protect victims such as C.T. Ohio is one of the states that has been hit hardest by the human trafficking epidemic. Ohio ranks fourth in the nation for the

"highest number of human trafficking cases reported to the National Hotline, after highly populated states California, Texas and Florida."[14]

26. Traffickers find Ohio particularly attractive because it has both large urban centers and rural counties; a sizable transient and immigrant population; and five major highways with easy access to other states and Canada. The location of Ohio's I-70 and I-75 corridors is ideal for human and sex trafficking.[15] Because of these factors, human trafficking "is a pervasive crime that touches every region of the state with its destructive acts of injustice, devastating the lives of those impacted in Ohio's cities, suburbs and rural communities."[16]

27. In evaluating the prevalence of human trafficking in Ohio, a recent study from the University of Cincinnati identified 1,032 known victims between 2014 and 2016 and another 4,209 individuals at risk of being trafficked during the same period.[17]

28. The FBI has named Toledo, Ohio as the fourth worst city in the country for human and sex trafficking. "An estimated 2,879 native Ohio adolescents are at risk for sex trafficking and another 1,078 have been trafficked into the sex trade over the course of a year."[18]

---

[14] *Ohio Human Trafficking Task Force Report 2019*, Ohio Human Trafficking Task Force, January 2015 at 5, *available at* https://humantrafficking.ohio.gov/OhioHumanTraffickingTaskForceReport0119.pdf.

[15] *See* Christen Johnson, Maggie Rechel, and Therese Zink, MD, MPH, *Yes, Virginia, Sex and Human Trafficking are Problems in Ohio*, The Ohio Family Physician, Spring 2015, *available at* https://medicine.wright.edu/sites/medicine.wright.edu/files/uploads/0/article/Human-Trafficking-Problems-in-Ohio.pdf

[16] *Ohio Human Trafficking Task Force Report 2019*, Ohio Human Trafficking Task Force, January 2015 at 5, *available at* https://humantrafficking.ohio.gov/OhioHumanTraffickingTaskForceReport0119.pdf.

[17] Valerie R. Anderson, Ph.D, Teresa C. Kulig, Ph.D., Christopher J. Sullivan, Ph.D., *Estimating the Prevalence of Human Trafficking in Ohio*, Ohio Office of Criminal Justice Services February 1, 2019 *available at* https://humantrafficking.ohio.gov/links/Ohio_Human_Trafficking_Prevalence_Study_Full_Report.pdf.

[18] Christen Johnson, Maggie Rechel, and Therese Zink, MD, MPH, *Yes, Virginia, Sex and Human Trafficking are Problems in Ohio*, The Ohio Family Physician, Spring 2015, *available at* https://medicine.wright.edu/sites/medicine.wright.edu/files/uploads/0/article/Human-Trafficking-Problems-in-Ohio.pdf

**SEX TRAFFICKING UNDER FEDERAL LAW**

29.     The requirements for civil liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

30.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."  This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

**FACTUAL ALLEGATIONS**

**A.     THE SEX TRAFFICKING INDUSTRY**

31.  Human trafficking is the world's fastest growing crime.[19] While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[20]

32.  Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

---

[19] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[20] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.

33. In 2010, the United States government released its Trafficking in Persons Report, which included an assessment of trafficking in the United States. The Trafficking in Persons Report 2010 stated that approximately 12.3 million adults and children were in forced labor, bonded labor, and force prostitution around the world, but that only 4,166 trafficking prosecutions were successful in 2009.[21]

34. During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity. It out to concern every community, because it tears at our social fabric. It ought to concern every business, because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[22]

35. Statistics released in 2014 by the International Labor Organization ("ILO") showed that approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex traffickers worldwide.[23] Put another way, the numbers showed that a sex trafficker's annual profit per victim was approximately $22,000.00.[24]

36. A scholarly article published in 2015 estimated that pimps could earn $25,000.00 to $33,000.00 per week selling in the Atlanta, Georgia area.[25] This volume of

[21] CNN Wire Staff, *U.S. human trafficking report includes U.S. cases for first time*, CNN.com (Jun. 14, 2010), available at https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.
[22] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.
[23] International Labour Office, *Profits and Poverty: The Economics of Forced Labour* (2014), at 13, *available at* https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.
[24] *Id.* at 15.
[25] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 4 (2015).

and profit from sex trafficking also aligned with internet advertising for the sex trafficking industry occurring in roughly the same time period. For example, in 2015, one advertisement in the Atlanta section of the www.backpage.com website triggered 181 clients, and calls or texts from twenty-seven (27) men expressing interest – in a span of just ninety (90) minutes.[26]

37. In December 2015, President Obama appointed eleven (11) survivors of human trafficking to the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[27]

38. The United States Department of Justice ("DOJ") brought 248 sex trafficking prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.[28] In the previous year, DOJ convicted a total of 184 human traffickers (inclusive of labor trafficking) and in the subsequent year, DOJ convicted a total of 439 human traffickers (inclusive of labor trafficking).[29]

39. Despite efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole, including Defendants, continued to lag behind in its efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[30]

40. Even estimates by attorneys *for the* hospitality industry indicate that eight (8)

---

[26] *Id.* at 5.

[27] U.S. Dep't of State, *2016 Trafficking in Persons Report* (2016), at 41, *available at* https://www.state.gov/documents/organization/258876.pdf.

[28] *Id*. at 389.

[29] Human Rights First, *Fact Sheet 2017* (2017), *available at* http://www.humanrightsfirst.org/sites/default/files/TraffickingbytheNumbers.pdf.

[30] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

out of ten (10) arrests for human trafficking occur in or around hotels.[31] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.[32]

41. Between 2007 and March 2015, more than 1,400 human trafficking cases have been reported to the National Trafficking Resource Center.[33]

42. "75% of survivors responding to Polaris' survey reported coming into contact with hotels at some point during their exploitation… Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."[34]

43. Reports by the Polaris Project were received and reviewed by the executives, directors and managers of Wyndham, Best Western International, Red Roof Inns, Inc., and La Quinta Holdings, Inc.

44. Upon information and belief, other publicly available information regarding trafficking in hotels was received and reviewed by Defendants Wyndham, BWI, RRI, and LQH during the time period 2008 to 2010.

45. Upon information and belief, between at least 2008 to 2010, Defendant Wyndham held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

46. Upon information and belief, between at least 2008 to 2010, Defendant

---

[31] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[32] U.S. Dep't of State, *supra* n.31, at 387.
[33] Polaris, *Human Trafficking and the Hotel Industry* (2015), *available at* https://polarisproject.org/resources/human-trafficking-and-hotel-industry.
[34] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels- recommendations (last visited Apr. 21, 2020)

RRI held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

47. Upon information and belief, between at least 2008 to 2010, Defendant BWI held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

48. Upon information and belief, between at least 2008 to 2010, Defendant LQH held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

49. Upon information and belief, between at least 2008 to 2010, Defendants held meetings through its trade organizations in which sex trafficking in its hotels was discussed.

50. Upon information and belief, during at least the 2008 to 2010 time period, emails were exchanged by employees of Defendants' respective brands that related to sex trafficking in hotels including Defendants' hotels.

## B. DEFENDANTS' COORDINATED FAILURE TO RESPOND TO SEX TRAFFICKING THROUGH TRADE ASSOCIATIONS

51. Defendants jointly and individually failed to prevent trafficking on their properties, by engaging in coordinated efforts to refuse to assess, respond to, or provide an adequate response to sex trafficking issues they knew or should have known was occurring in their industry in a manner that would solve the problem.

52. Defendants also regularly coordinate and communicate with respect to other issues—for instance, avoiding liability as employers under federal and similar state laws.

53. Defendants agreed that human trafficking was a problem globally, but not

one brand admitted that human trafficking was a problem in their businesses at their brand locations.

54.     As to the conspiracy, Defendants' "solution" to the problem of human trafficking was always the same—to give lip service about more employee training, and to identify some red flags related to trafficking. But this employee training never really occurred en masse. For instance, according to the reporting in ECPAT's reports, the actual number of employees trained is abysmal. Moreover, although the training may provide some information in identifying trafficking, it provides no clear message on training that will serve to eliminate human trafficking.

55.     To curry more favor with the public, Defendants together, most often through state and national associations like the Ohio Hotel & Lodging Association ("OHLA") and the American Hotel & Lodging Association ("AHLA")[35]—where Defendants are all members[36]--advertise policies, practices, and procedures that can indicate a unified commitment to fighting human trafficking.[37]

56.     The AHLA and OHLA served as a forum for Defendants to discuss efforts related to human trafficking and as a voice from which the Defendants could address the issue with the public.

57.     The AHLA and OHLA benefited from membership dues and fees that its

---

[35] For more than 100 years, AHLA has been the foremost representative and advocate for the U.S. lodging industry and the only national association the represents all segments of an industry that is among the 10 largest business sectors in America. From major global brands to the small inns and bed & breakfasts, AHLA provides a singular voice that brings together the industry's multitude of constituents. AHLA is diverse and represents everyone from brand CEO's to independent hotel owners, general managers, and hotel staff and is an integral contributor to the American economy. *See* American Hotel & Lodging Association, *Who We Are*, available at https://www.ahla.com/who-we-are (last visited Apr. 22, 2020).

[36] *See* American Hotel & Lodging Association, *Our Members*, available at https://www.ahla.com/our-members.

[37] *See, e.g.,* NICHOLS, ANDREA J., SEX TRAFFICKING IN THE UNITED STATES (2016) (citing American Hotel and Lodging Association. 2012. "Industry Principles to Combat Human Trafficking." http:/www.ahla.com/uploadedFiles/_Common/pdf/Trafficking_Principles_Industry_Update.pdf) (note that AHLA's Industry Principles article has since been removed from its website).

members generated as a result of human trafficking.

58. The AHLA and OHLA knew or should have known that Defendants used its associations as a means to avoid compliance with federal laws related to trafficking.

59. The AHLA and OHLA both include many articles related to human trafficking and what the industry has done to "fix" the problem. While much of this content expresses a deep concern for the issue of human trafficking, it reveals that no real effort has been undertaken to actually prevent the issue.

60. Hotel Defendants speak through their trade organizations seeking to conceal their lack of effort to combat human trafficking. Defendants minimized the extent of human trafficking in the industry and totally failed to implement, analyze and review policies that would at a minimum help record occurrences or suspected occurrences of trafficking.

61. In furtherance of their conspiracy, through national hotel industry trade associations, Defendants disseminated very specific talking points to provide to the government, law enforcement, the public, and the media. These talking points amounted to nothing but spin whereby defendants tote themselves as heroes.

62. As part of an industry wide conspiracy, Defendants failed to articulate a policy, process, or procedure that would measure the extent of the trafficking problem at their branded locations. They essentially all allowed their co-conspirators to perpetuate the lie that trafficking was not a problem on their brand properties. Moreover, Defendants did not articulate a policy, process, or procedure that could measure whether the "employee training" had the effect of reducing instances or expected in instances of human trafficking.

63. Hotel Defendants collectively conspired and declined to implement policies that would likely have the effect of reducing the billions of dollars in sex trafficking profits. As a whole, Defendants did not call for stricter room rental requirements. For example, Defendants did not require ID or names of every person staying in the room; did not limit the number of people allowed to stay in a room; and did not require a credit or debit card to be placed on file with a name on it (accepting prepaid credit cards and even cash). In short, Defendants refused to communicate to traffickers "your business and your money are not welcome here."

64. Through this conspiracy, Defendants were able to rest assured they would not have to implement actual effective policies and procedure. Given that human trafficking does more than $100 billion in business a year and the fact that a large percent of all trafficking ventures occur at hotels and motels—there can be no doubt that Defendants, as an industry, generate billions of dollars every year from human trafficking ventures. Therefore, through their conspiracy, Defendants were able to save the time and expense of implementing effective policies—time and money that (at least initially) do nothing but eliminate the steady revenue stream paid to the hotel industry every year.

65. Defendants' actions as part of this conspiracy served to unfairly restrict trade and competition. Defendants guaranteed that they would not have to compete with a national branded property that put together a policy that eliminated trafficking from their branded properties While it would be challenging and expensive (both business expenses and lost revenues from traffickers) to implement effective policies, it is apparent that an effective policy would create a long term competitive advantage for the individual defendant. In short, a business that implemented an effective policy could easily provide

reportable data on how it reduced trafficking at its brand properties. Moreover, it could exploit the fact that other defendants are completely ignoring that a problem exists at their brand properties. The complying hotel could explain how other brand hotels will never be able to effectively battle the problem until they admit it exists on their properties. Thus, in the long run, an effective would generate public support and create brand loyalty, resulting in greater revenues and profits.

66. The American Hospitality & Lodging Education Institute ("AHLEI"), the nonprofit education and training arm of AHLA, served as a forum through which leaders of hospitality brands devised and distributed resources related to human trafficking to Defendants.[38]

67. Defendants have been involved in AHLA, and other state and national associations such as OHLA, since at least 2008.[39]

68. Moreover, many brands, such as Defendants Wyndham, LQH, BWI, and RRI have served on executive committees or as board members in AHLA or other state and national associations such as OHLA since at least 2008.

69. Defendants RRI, Wyndham, BWI, and LQH are well aware of the best policies, practices, and procedures and how they are advertised because Defendants, their representatives, and employees, hold various positions in management, boards, councils, and committees while the same or other representatives and employees are members who attend or present at events, conferences, and training seminars.

70. Through the AHLA, brands such as Wyndham have come together with

---

[38] *See* Hospitality Net, Educational Institute Launches Online Course to Increase Awareness of Human Trafficking at Hotels, available at https://www.hospitalitynet.org/news/4063525 html.
[39] *See* American Hotel & Lodging Association, *Partner State Associations*, available at https://www.ahla.com/psa.

other brand CEOs to advertise their commitment to policies such as the 5-Star Promise.[40] In 2018, in a "show of unity," several major brands committed to the 5-Star Promise and advertised that they have since completed the remaining pillars of the pledge.[41] But this 5-Star Promise amounts to no real promise to do anything to stop profiting from human trafficking.

71. Defendant hotels jointly benefited from participating in a venture that ensured sex trafficking occurred on each other's premises—it ensured each Defendant could continue to profit from the sex trafficking ventures occurring on their premises and avoid costly changes related to complying with the TVPRA.

72. Defendant associations jointly benefit from the Defendant Hotels work to avoid compliance with the TVPRA and to continue reaping profits from sex trafficking.

73. Often the national and state associations work in unison to promote the industry and lodging business' best interests. For example, AHLA and the Ohio Hotel and Lodging Association co-hosted an event in 2017 with Ohio Congressman Bob Latta at the Wingate by [Defendant] Wyndham Sylvania/Toledo hotel as part of AHLA's "Heart of the House" hotel tour program. This event consisted of a tour of the Wingate hotel and afterwards a "roundtable discussion with AHLA, the Ohio Hotel & Lodging Association ("OHLA"), and more than two dozen local hoteliers on issues facing the industry. Topics included travel and tourism promotion, consumer protection, and the positive contribution hotels offer to the local community through job growth and

---

[40] *See* American Hotel & Lodging Association, *5 Star Promise*, available at https://www.ahla.com/5star (last visited Apr. 22, 2020); https://www.ahla.com/press-release/hotel-industry-announces-added-safety-measures-employees-builds-layers-security.

[41] *See* https://www.ahla.com/press-release/hotel-industry-marks-significant-progress-toward-2020-nationwide-implementation

economic development.[42]

74. In another example, *see* Ohio Hotel and Lodging Association's Twitter page that promotes AHLA's anti-trafficking campaign, tags AHLA, and uses their recommended hashtag:



75. Defendants worked together through representation by AHLA and other hotel associations[43] to lobby, successfully, against legislation that would hold them accountable for human trafficking occurring at their hotels and to influence legislators' perceptions of the hotel industry's role in human trafficking.[44]

---

[42] *See* American Hotel & Lodging Association, *REP. LATTA TOURS WINGATE BY WYNDHAM SYLVANIA/TOLEDO, PARTICIPATES IN ROUNDTABLE WITH TWO DOZEN LOCAL HOTELIERS*, available at American Hotel & Lodging Association.

[43] "In partnership with AAHOA, AHLA, and other associations at the local and state levels, we took the high road – remaining unified and focused on the future. Thanks to their leadership, we have strengthened our industry and made critical changes to better serve our core constituents: team members, guests, and investors. "Our unified voice has tackled legislative affairs at statehouses, Congress, and even the White House, allowing us to stay in control of our own destiny." *A unified voice in hospitality*, available at https://www.todayshotelier-digital.com/aahom/0119_january_2019/MobilePagedArticle.action?articleId=1450629#articleId1450629

[44] "Whether at the local, state, or federal level, your business and all hoteliers benefit from increased representation of the hotel industry. Highlighting AAHOA's efforts on human trafficking prevention, for example, can directly impact the way legislators perceive the role of hotels in human trafficking cases. Many state legislatures are currently considering holding hotels liable if a trafficker uses the premises to move or

76. As recently as January 2019, the hotel industry, through AHLA, has refused to acknowledge that compliance with federal law under the TVPRA requires implementing employee training and business policies and procedures.[45]

77. Even though Defendants were aware of the best policies, practices, and procedures necessary to fight human trafficking and despite Defendants' part in formulating, assessing, and promoting the best policies, practices and procedures together, Defendants failed to implement them by, among other acts, omissions and commissions described in this complaint:

    a. Reducing the costs of training employees and managers how to spot signs of human trafficking.

    b. Failing to refuse room rentals or report guests to law enforcement; and

    c. Lowering a number of security costs and measures that could have combatted sexual trafficking and exploitation.

78. In 2010, the Christian Brothers Investment Services ("CBIS") specifically noted that Defendant BWI "lack[s] programs to deal with child sexual exploitation."[46] CBIS' efforts were applauded by BWI, but ultimately ignored as BWI deflected its responsibility to prevent human trafficking elsewhere.[47]

---

exploit victims. In reality, hoteliers are working hard to combat trafficking in every way they can, including completing AAHOA's awareness training offered through our partnerships with Businesses Ending Slavery & Trafficking (BEST) and Polaris. Instead of working separately to achieve the same goal, hoteliers can bridge this gap and show state officials that our industry can be a resource for them in their efforts to bring trafficking to an end." *Building relationships with lawmakers,* Available at https://www.todayshotelier-digital.com/aahom/0519_may_2019/MobilePagedArticle.action?articleId=1481376#articleId1481376

[45] AHLA, *Unpacking Human Trafficking*, *See* AHLA, *Unpacking Human Trafficking*, https://www.ahla.com/sites/default/files/Unpacking%20Human%20Trafficking-v4.pdf (asserting that training is only required under some state laws).

[46] Christian Brothers Investment Services, *Final Results of the Initiative On Hotels and Human Trafficking at the World Cup*, at 2 (2010).

[47] Response of Best Western International to the appeal of Christian Brothers Investment Services to take action to prevent human trafficking in South Africa, *available at* https://www.business-humanrights.org/sites/default/files/reports-and-materials/Best-Western-response-re-CBIS-trafficking-appeal-

79.     To date, Hotel Defendants have failed to train all of their employees to look for signs of trafficking.

80.     The failure to implement best policies, practices, and procedures was not an oversight by Defendants Wyndham, BWI, RRI, and LQH.

81.     Defendants deliberately disregarded the implementation of best known policies, practices, and procedures to maintain profit.

82.     Defendants knew that their expenses would increase if they hired more security personnel and funded more training programs. Additionally, Defendants would lose revenue by preventing human traffickers from renting rooms. The combination of increased expenses and lost revenue meant less profit. In fact, profits were the driving force of their hollow "No Room for Trafficking" campaigns, as they improved Defendants image without any real impact on operations.

83.     Additionally, Defendants knew or should have known that unless they all implemented the best policies, practices and procedures, the Defendants who did would be at a competitive disadvantage to those that did not. Specifically, Defendants refused to implement best policies, practices, and procedures, and instead concocted and eyewash campaign, so that they would have less expenses and more revenue than Defendants who actually went through with implementation.

84.     Therefore, Defendants knew their continuation of revenue and profit streams relied on Defendants' collective ability to maintain the status quo which meant continuing to financially benefit from actions, omissions, and commissions that violated the TVPRA. Additionally, Defendants knew that joining a campaign to fight human trafficking could help their brand, even if they had no intention of following through with

actions to do so. As a result, Defendants had an incentive to communicate with each other about not highlighting, revealing, or even discussing each other's failures in implementing best policies, practices and procedures.

85. Through common understanding and by design, Defendants created this perception as an industry that was tough on human trafficking to shield their actual policies, practices and procedures that helped them knowingly benefit financially, by maintaining profit and revenue, by participating in, and facilitating, the harboring and providing of C.T. for the purposes of commercial sex induced by force, fraud, or coercion

86. Without understanding and agreement from all Defendants, the marketing campaigns would not have been as wide spread and thus the failure to implement business-wide best policies, practices and procedures would have been more blatant.

87. The interaction and length of the relationships between and among the Defendants, such as their involvement in the century old AHLA, state associations like OHLA, and their partnerships with The Polaris Project, and ECPAT-USA, reflects a deep level of interaction and cooperation between Defendants in a tightly-knit industry. The Defendants were not separate groups operating in isolation or forced to work together in a closed system. Defendants operated together as a united entity, working together on multiple fronts, to engage in unlawful acts, omissions and commissions.

88. At all times relevant, in anticipation of litigation and regulatory action, AHLA and OHLA acted as a mouthpiece for its members, including the Hotel Defendants named herein. AHLA and OHLA are in large part reliant on funding from hotel industry companies and were motivated to minimize the impact legislative proposals had on industry brands, including the Hotel Defendants. Upon information and

belief, at all times relevant, AHLA and OHLA's revenues have been predominantly generated through a dues system based in part on its members.

89.     Defendants used their membership in associations and in other forms of collaboration to form agreements about their marketing approach and in determining the extent in which to utilize best policies, practices and procedures.

## C.  DEFENDANTS' PARTICIPATION IN SEX TRAFFICKING AT THEIR PREMISES

90.     Defendants played a crucial role in the sex trafficking industry.[48]

91.     Plaintiff understood when she stayed at defendants' branded locations that those individuals working at the location were agents, representatives, and or employees of Defendants and were authorized to transact business on behalf of Defendants. Plaintiff understood that the money paid to book her room went to Defendants and Defendants' branded property. And Defendant Associations understood that their dues and fees were paid with those profits.

92.     Hotel Defendants understood that employees at brand locations were considered employees of the Defendants and certainly were employed under their Brand standards. Indeed, Defendants through trade organizations attempted to fight the legal determination that employees at brand locations were Defendants' employees.

93.     For instance the hotel industry through OHLA tried to introduce legislation in order to avoid liability as an employer under federal laws. In a government affairs press release the association noted, "Joint employment standards have been problematic for lodging and other businesses since a 2015 decision by the National Labor

---

[48] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

Relations Board that redefined that relationship. The latest attempt to update this rule and limit the scope of liability was introduced this month by the U.S. Department of Labor. The proposed new rule would apply a test of four factors: whether the employer hires/fires the employee; supervises and controls the employee's work schedule or conditions of employment; determines the employee's rate and method of payment; and maintains the employee's employment records."[49]

94. All of the documents signed, electronically and in paper form, to book a room, and advertisements of the Defendants' property established that those individuals working at the property were working on behalf of Defendants (that own the brand property).

95. Each Defendant knowingly marketed and or provided goods or services to C.T.'s trafficker including but not limited to renting rooms, providing services available the property such as Wi-Fi access, food, seating in public areas, cleaning the room.

96. Defendants knew or should have known that the anonymity conveniently provided to buyers and pimps made their hotels ideal venues for sex trafficking.

97. Defendants knew or should have known that hotels are the top-reported venue where sex trafficking acts occur.[50]

98. RRI knew or should have known that trafficking was taking place from at least 2008 to 2010 at the Red Roof Inn where Plaintiff was trafficked.

99. Wyndham knew or should have known that trafficking was taking place from at least 2008 to 2010 at the Days Inn and Travelodge hotels where Plaintiff was

---

[49] OHLA, *Government Affairs Update*, April 3, 2019, *available at* http://ohiolodging.com/aws/OHLA/asset_manager/get_file/316892?ver=1573
[50] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

trafficked.

100.     LQH knew or should have known that trafficking was taking place from at least 2008 to 2010 at the La Quinta Inn where Plaintiff was trafficked.

101.     BWI knew or should have known that trafficking was taking place from at least 2008 to 2010 at the Best Western Inn where Plaintiff was trafficked.

102.     Defendants RRI, Wyndham, LQH, and BWI knew or should have known that traffickers used their hotels as hubs of operations. Inside, the victims, including Plaintiff, were harbored, raped, assaulted, and forced to obey and follow buyers who come to the hotel solely to purchase sex.

103.     Defendants knew or should have known that their hotels are also venues of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e. those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels, that stand to financially benefit.

104.     At all relevant times herein, Defendants knew or should have known that sex trafficking in hotels was industry wide, included their hotels, and that a significant portion of all sex trafficking was taking place at its hotels.[51]

105. Due to the Defendants' joint failures to act and their decision to conspire together to prevent the implementation of protections and measures to eradicate trafficking at their properties, hotels remain *the* venue of choice for sex trafficking.[52]

---

[51] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[52] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

106. Due to Defendants' failures to enact policies and procedures to comply with the TVPRA, Defendants, in essence, turned a blind eye to human trafficking. Therefore, the Defendants' failure to look into human trafficking is sufficient to conclude that Defendants knew or should have known of human trafficking that occurred at their respective locations.

107. From at least 2008 to 2010 and to date, traffickers and buyers used and use hotel rooms, including those rented by Defendants, due to Defendants' failures and/or refusals, both individually and collectively in conspiracy with one another, to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, to train staff on what to look for and how to respond, and/or to establish safe and secure reporting mechanisms for those at the point of sale and booking for rooms.

108. Upon information and belief, Defendants RRI, Wyndham, BWI, and LQH took no measures to prevent sex trafficking at its hotels or profiting from sex trafficking at its hotels, despite a duty to do so under the TVPRA. The decision not to implement measures to prevent sex trafficking was made both individually and collectively in conspiracy with one another.

109. Upon information and belief, Defendants, through their employees, including executives, directors, and managers, both individually and collectively in conspiracy with one another, knowingly failed to take measures to prevent sex trafficking at their hotels or profiting from sex trafficking at its hotels, including the Red Roof Inn, Days Inn, Travelodge, Best Western Inn, and La Quinta Inn branded properties where Plaintiff was trafficked.

110. Upon information and belief, Defendants, through their employees, including

executives, directors and managers, both individually and collectively in conspiracy with one another, decided not to take any measures to prevent sex trafficking at their hotels in order to conceal the fact that sex trafficking was occurring at their hotels.

111. Traffickers and buyers capitalize on the Defendants' general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

112. Traffickers, such as those who trafficked Plaintiff, and buyers capitalize on the Defendants' general refusal to develop, review, manage, or establish internet security access systems within their hotels despite controlling, obtaining, and housing internet usage data for marketing purposes.

113. Every day, thousands of hotel employees across the county witness manifestations of sex trafficking and commercial exploitation. Thus, as brand managers, the Defendants have the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.[53]

114. But aside from their unique position in this epidemic, Defendants have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to

---

[53] *Combating Human Trafficking in the Hotel Industry*, HUFFPOST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 (last visited November 18, 2019).

do so."[54]

115. Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently demonstrated by signs Defendants knew or should have known involved trafficking, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[55]

116. From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of reasonable security measures, including refusals to rent rooms to known traffickers engaged in sex trafficking, hospitality companies could prevent regular and rampant sex trafficking under their flag.

117. Defendants knew that the signs of sex trafficking at a hotel typically include more than one of the following: multiple unregistered visitors to a room, an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of

---

[54] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017),
http://scholarship.sha.cornell.edu/honorstheses/3.
[55] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A."
Available at:
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[56]

118.	Furthermore, upon information and belief, Defendants lobbied and took funds under 22 U.S.C. § 7104, which provides federal grants for companies who vow to monitor and combat trafficking and help victims of sexual exploitation since 2003.[57] Instead of using those funds to develop programs to end trafficking, those funds were used to increase brand loyalty and recognition in the fight against trafficking.

119.	Defendants—and the associations that Defendants, their representatives, and employees work with—advertise, through mediums like social media and websites, their dedication to fighting human trafficking.

120.	Individually, Defendant Wyndham, who owns, operates, supervises, and or controls Defendant LQH's brand, displays the following on its website:[58]

---

[56] *Id*. *See also*, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf; ECPAT-USA Anti-Trafficking Hotel Checklist, *available at* https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf

[57] *See, e.g.,* https://skift.com/2014/03/12/how-cellphone-photos-of-hotel-rooms-can-combat-sex-trafficking/ (last visited Apr. 21, 2020) (Marriott secured $550,000 in federal grants to monitor and combat trafficking and help victims of sexual exploitation, but did not address evidence of sex trafficking in one of its St. Louis hotels).

[58] *See* Wyndham Hotels & Resorts, *Committed to Doing What's Right*, available at https://corporate.wyndhamhotels.com/social-responsibility/.





A Commitment to Protecting
Human Rights

Putting a stop to human trafficking is a
major priority for us and our entire
industry. Together with our franchisees, we
support the UN Universal Declaration of
Human Rights and the Polaris Project,
which combats all forms of human
trafficking.

121.     Like Defendant Wyndham, Defendant RRI commits itself to the idea that people should not be exploited.[59]

                                                    Deals    ≡

Social Responsibility

Red Roof condemns all forms of human trafficking. Red Roof supports every person's right to safety and security and is committed to the principle that everyone has the right to live without fear of exploitation.

122.     Defendant BWI represents from its website that they will fight child exploitation.[60]

---

[59] *See* Red Roof, *Social Responsibility,* available at https://www.redroof.com/corporate-responsibility/social-responsibility.

[60] Best Western Hotels & Resorts, *Protection of Children's Rights*, available at https://www.bestwestern.com/en_US/about/press-media/best-western-human-rights-policy.html.

## Protection of Children's Rights

Best Western International condemns all forms of child exploitation. Best Western International does not recruit child labor, and it supports the elimination of exploitative child labor. Best Western International also supports legislation enacted to prevent and punish the crime of sexual exploitation of children. Best Western International will work to raise awareness concerning such exploitation, including through its continued partnership with World Vision, an organization committed to fighting the exploitation of children, and will cooperate with law enforcement authorities to address any instances of exploitation of which Best Western International becomes aware.

We are dedicated to respecting fundamental human rights and to continued dialogue on the principles set forth in this statement as we fulfill our vision as a company.

123. But the truth is that Defendants never followed through with their commitments to fight human trafficking.

124. Defendants failure to implement policies and procedures, as well as laxed information requirements to rent rooms, equates to knowingly marketing to human traffickers.

125. The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with hotel chains. .Traffickers know it is unlikely that they will be disturbed at Defendant brand hotels and understand the implicit rules of each hotel to allow for their nefarious acts to continue without .

126. Due to the hospitality industry's joint efforts to work against the

implementation of anti-trafficking policies and practices, children and other vulnerable persons are trafficked for sex in brand hotels that advertise their anti-trafficking efforts throughout the United States.

127. For years, Defendants have been aware of and monitored the anti-trafficking activities of the hospitality industry as a whole and that of specific competitors including those discussed throughout this Complaint.

128. To this day, Defendants continue to financially benefit from what they know or should know is sex trafficking.

**D. THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY**

129. Hotel brands or flags, including Defendants, lend their name and likeness to third party owners, while the building and operations are run by a franchisee or a third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract and still profits from putting heads in beds.

130. Defendants provide to their properties signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand. The same brand emblazoned on everything in the hotel from the pens at the bedside tables to the staff uniforms at the front desk.

131. In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand wide central reservation system, 800 number, revenue management tools, brand loyalty programs and a company

website.  Thus, booking and room reservations are controlled by the Defendants.[61]

132.	Upon information and belief, the Red Roof Inn, Best Western Inn, Days Inn, Travelodge, and La Quinta each are required to develop and maintain the property in accordance with their respective brand's standards and typically pay around 10% of their total revenue back to their respective parent companies (Wyndham, RRI, BWI, LQH) for the benefits of flying their recognized flags.

133.	Upon information and belief, per the franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the franchise agreement if the branded hotels are found to be inadequate or out of compliance. The right of the Defendants to enforce their respective brand standards is also their responsibility.

134.	At the time of the incidents alleged herein:

    a.	Defendant Wyndham owned and controlled the Days Inn® brand.

    b.	Defendant Wyndham owned and controlled the Travelodge® brand.

    c.	Defendant BWI owned and controlled the Best Western® brand.

    d.	Defendant LQH owned and controlled the La Quinta Inn® brand.

    e.	Defendant Red Roof Inns, Inc. owned and controlled the Red Roof Inn® brand.

135.	Defendants could have knew of rampant trafficking at the Red Roof Inn, Best Western Inn, La Quinta Inn, Days Inn, or Travelodge hotels and did not kick any one of them out of their system due to the expense of terminating their royalty payments, and losing customers, including both the traffickers and those purchasing sex with

---

[61] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

anonymity in their hotels.

**E.      THE DEFENDANTS' ACTUAL AND/OR CONSTRUCTIVE KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTELS**

136.      Defendant Hotels Wyndham, BWI, LQH, and RRI have been on notice of repeated incidences of sex trafficking occurring at their Days Inn®, Best Western, Travelodge, La Quinta Inn, and Red Roof Inn hotels, yet these brand managers failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

137.      Several courts have found that failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[62]

138. WYNDHAM HOTELS AND REORTS, INC. ("WYNDHAM"):

   a.   Defendant Wyndham owns, supervises, or operates the Days Inn® located at 11435 S. Cleveland Ave.  Ft. Myers, FL 33907. Wyndham failed to implement and enforce any of its own policy or policies and protect Plaintiff C.T. from being sex trafficked.

   b.   Defendant Wyndham has constructive knowledge of all sex trafficking occurring on all of its premises because it turned a blind eye to the issue and failed to attempt to comply with the TVPRA. This failure to even look is sufficient to implicate constructive knowledge to Wyndham for all sex trafficking ventures on every property.

---

[62] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009) (finding willful blindness where defendants knew that a supervisor at a correctional facility raped his employee, sexual harassment at the facility "was not an isolated incident," and defendants failed to "implement and effectuate appropriate policies.. to remedy and/or prevent the discriminatory conduct, sexual abuse and sexual harassment and rape."); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (.E.D. Tenn. May 29, 2007) (finding that a "willful blindness policy" could be sufficient to show a RICO violation).

c. For years Defendant Wyndham has been on notice of repeated incidences of sex trafficking occurring on its Days Inn® by Wyndham and Travelodge® by Wyndham branded properties, yet Defendant Wyndham has failed to take action to prevent sex trafficking at Days Inn® by Wyndham and Travelodge® by Wyndham brand properties and still persists in failing to take necessary action to prevent sex trafficking on its properties. Defendant Wyndham's inattention in this regard enabled and contributed to the sex trafficking the Plaintiff suffered at the Days Inn® by Wyndham and Travelodge® by Wyndham hotels.

d. There are numerous examples across place and time of Defendant Wyndham's knowledge of sex trafficking on its branded properties and its continued, total inattention to preventing and remedying the blight of human trafficking on the lives and liberties of its victims.

e. In 2011, Defendant Wyndham's predecessor entity Wyndham Worldwide Corporation, signed the Code, but as evidenced by the widespread sex trafficking which continued to occur at Defendant Wyndham's branded properties, Defendant Wyndham did not practice what it preached. Defendant Wyndham's adoption of the Code appears to have been nothing more than a strategic maneuver through which it sought a shield against liability but not a sword against human trafficking.

f. Despite Defendant Wyndham's anti-trafficking stance, Defendant Wyndham failed to implement and enforce any of its own policy or policies including with respect to the Days Inn® by Wyndham and

Travelodge® by Wyndham. Defendant Wyndham knew or should have known that the Days Inn® by Wyndham was located in an area known for sex trafficking activity, and sex trafficking and prostitution continued to regularly occur on and around their branded hotel premises, including when C.T. was trafficked.[63] Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its branded hotels, Defendant Wyndham failed to take adequate measures to prevent the ongoing torture and trafficking of C.T.

g. Defendant Wyndham had actual knowledge of sex trafficking occurring on its branded hotel properties because Wyndham, Days Inn, and Travelodge knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that pimp-sex trafficking victim/prostitute interactions involves the use of force, fraud, and coercion. Wyndham and Days Inn allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Days Inn. Wyndham and Days Inn facilitated the trafficking through its practices, policies, and procedures.

---

[63] *See, e.g., Alexis Stevens,* Atlanta Journal-Constitution, *Four Accused Of Running Prostitution Ring At Clayton County Hotels* (Jan. 12, 2016), https://www.ajc.com/news/crime--law/accused-running-prostitution-ring-claytoncounty-hotels/gPhfieHiNuiov9xM0CmmJO/ (undercover investigation leads to arrests at Atlanta-area Days Inn by Wyndham); *Brian Newlin*, ClickOnDetroit.com, *Man Accused Of Getting Women Hooked On Drugs, Forcing Them Into Prostitution In Southeast Michigan* (Mar. 28, 2018), https://www.clickondetroit.com/news/man-accused-offorcing-women-into-prostitution-in-southeast-michigan (three women held against their will and forced into prostitution at Days Inn); *Matt Johnson*, WSBTV-Atlanta, *Fourteen-Year-Old Among Girls Saved From Motel Prostitution Ring, Police Say* (Mar. 9, 2018), https://www.wsbtv.com/news/local/cobb-county/14-year-old-amonggirls-saved-from-motel-prostitution-sting-police-say/713242739 (police save 14-year-old from pimps at Days Inn); *Andrea Gallo*, The Advocate, *Baton Rouge Passes Ordinance To Curb Sex Trafficking, Drugs, Prostitution At Hotels* (Jan. 24, 2018), https://www.theadvocate.com/baton_rouge/news/article_ac478eb0-0132-11e8-be36-6bb6c3a45ac0 html (frequency of police calls from Days Inn leads to action by Baton Rouge City Council).

Wyndham, Days Inn, and the Travelodge failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham, Days Inn, and Travelodge could continue to profit from the business that trafficking brings, including business from out-of-state tourists.

h. Defendant Wyndham had constructive knowledge of sex trafficking occurring on its branded hotel properties because Wyndham, Days Inn, and Travelodge knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Wyndham, Days Inn, and Travelodge allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Days Inn and Travelodge hotels. Wyndham, Days Inn, and Travelodge facilitated the trafficking through its practices, policies, and procedures. Wyndham, Days Inn, and Travelodge failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham, Days Inn, and Travelodge could continue to profit from the business that trafficking brings, including business from out-of-state.

i. Wyndham knew or should have known that the Days Inn$_®$ and Travelodge$_®$ hotel where Plaintiff C.T. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff C.T. was trafficked.

j. Despite having knowledge of the extensive prostitution and sex

trafficking that occurs at its hotels, Defendant Wyndham has repeatedly failed to stop these actions.

k. Defendant Wyndham exercised control over Days Inn$_®$ and Travelodge$_®$ hotels by:

    i. distributing information to assist employees in identifying human trafficking;

    ii. providing a process for escalating human trafficking concerns within the organization;

    iii. requiring employees to attend training related to human trafficking;

    iv. providing new hire orientation on human rights and corporate responsibility;

    v. providing training and education to Days Inn$_®$ branded hotels through webinars, seminars, conferences, and online portals;

    vi. securing, monitoring and controlling internet access;

    vii. developing and holding ongoing training sessions on human trafficking; or

    viii. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

l. Wyndham was in an agency relationship with Days Inn$_®$ and Travelodge$_®$ branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Wyndham's exercise of an ongoing and systemic right of control over Days Inn$_®$ and Travelodge$_®$ hotels by Defendant Wyndham's operations, including the

means and methods of how Days Inn® and Travelodge® branded hotels conducted daily business through one or more of the following actions:

  i. hosting online bookings on Defendant Wyndham's domain;

  ii. requiring Days Inn® and Travelodge® branded hotels to use Defendant Wyndham's customer rewards program;

  iii. setting employee wages;

  iv. making employment decisions;

  v. advertising for employment;

  vi. sharing profits;

  vii. standardized training methods for employees;

  viii. building and maintaining the facility in a manner specified by the owner;

  ix. standardized or strict rules of operation;

  x. standardized internet security, network log, or Wi-Fi accessibility;

  xi. regular inspection of the facility and operation by owner;

  xii. fixing prices; or

  xiii. other actions that deprive Days Inn® and Travelodge ®branded hotels of independence in business operations.

m. An apparent agency also exists between Defendant Wyndham, Days Inn, and Travelodge hotels. Defendant Wyndham held out Days Inn® and Travelodge® branded hotels to the public as possessing authority to act on its behalf.

n. Given Defendant Wyndham's public statements on behalf of its hotel

brands and the control it assumed in educating, implementing, and directing its branded hotels, including Days Inn® and Travelodge® branded hotels, Defendant Wyndham breached its duties in the following ways:

    i.  did not adequately distribute information to assist employees in identifying human trafficking;

    ii.  failed to provide a process for escalating human trafficking concerns within the organization;

    iii.  failed to monitor security internet logs, network logs and servers for high traffic from their hotel to  escort and adult websites signaling trafficking activity in their hotels;

    iv.  failed to mandate managers, employees, or owners attend training related to human trafficking;

    v.  failed to provide new hire orientation on human rights and corporate responsibility;

    vi.  failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    vii.  failed to develop and hold or require ongoing training sessions on human trafficking; or

    viii.  failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

o.  For years, Defendant Wyndham has failed to address the rampant culture

of sex trafficking which tragically occurs on its Days Inn® and Travelodge® branded properties throughout the country. This entrenched apathy to the real risk of sex trafficking and pervasive actual and/or constructive knowledge of sex trafficking on its properties facilitated the sex trafficking of Plaintiff C.T. at Days Inn® and Travelodge® hotels that forms the basis of this complaint.

    i. In July 2008, a woman was arrested during a police stakeout at a Days Inn and charged with prostitution for allegedly trading sex for gasoline, while the buyer was charged with promoting prostitution.[64]

    ii. In February 2010, a prostitution sting that started with a Craigslist ad ended with three metro Atlanta women and a 15-year-old Atlanta girl being arrested at a Days Inn hotel.[65]

    iii. In March 2010, a high-profile personal injury lawyer was arrested by Petersburg Police at a Travelodge motel on charges of soliciting a prostitute.[66]

    iv. In 2014, after several undercover operations, detectives discovered women advertising themselves on websites and directing their customers to the Mission Valley Travelodge. As a result, the San

---

[64] Sex for Gas, THE SMOKING GUN (Jul. 2, 2008), http://www.thesmokinggun.com/documents/crime/sex-gas.

[65] Larry Hartstein, *Craigslist prostitution sting nets 4 arrests*, THE ATLANTA JOURNAL-CONSTITUTION (Feb. 9, 2010), https://www.ajc.com/news/local/craigslist-prostitution-sting-nets-arrests/HvY72Eh4nKE1Ej7jo4WIyH/

[66] *Top Lawyer Arrested for Soliciting Prostitute*, STYLE WEEKLY (Apr. 28, 2010), https://www.styleweekly.com/richmond/top-lawyer-arrested-for-soliciting-prostitute/Content?oid=1383889.

Diego City Attorney's Office ordered the Travelodge to increase security and make immediate changes in order to crack down on prostitution activity on the premises.[67]

v. Additionally, Defendant Wyndham has been aware of sex trafficking on Days Inn and Travelodge brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Days Inn and Travelodge brand properties and Defendant Wyndham's inattentiveness, for example:

- In September of 2007, a reviewer described a Days Inn in Spartanburg, South Carolina as follows: "When leaving the room, two prostitutes informed us that, 'We've used most of the rooms here and they were fine.' We left and stayed at the Choice Inn across the road."[68]

- In July 2009, a reviewer described the Travelodge Lake Erie Sandusky as "Great Value… for Prostitutes/Drug Dealers to do business!"[69]

- Regarding a February 2012 stay at a Travelodge in

[67] *Another Mission Valley Hotel Ordered to Curb Prostitution Activity*, NBC SAN DIEGO (Feb. 4, 2014), https://www.nbcsandiego.com/news/local/Mission-Valley-Travelodge-Hotel-Prostitution-Crackdown-243554781.html.

[68] Review of Days Inn by Wyndham Spartanburg Waccamaw, Spartanburg, SC (Sept. 29, 2007), *available at* https://www.tripadvisor.com/ShowUserReviews-g54448-d97597-r10019529-Days_Inn_by_Wyndham_Spartanburg_Waccamaw-Spartanburg_South_Carolina.html.

[69] Review of Travelodge Lake Erie Sandusky, Sandusky, OH (Jul. 27, 2009), available at http://www.thesmokinggun.com/documents/crime/sex-gas.

Ozone Park, New York, a customer wrote a review titled, "Prostitute central" and continued to explain: "Checked in for an overnight stay before leaving from Kennedy airport. Had a young lady before be (sic) checking in asking for extra sheets, hmmm. After getting in to our room we heard activities (if you know what I mean) going on in the room next to us all night along with arguing, etc. when checking out there was a "young lady" arguing with the police at the counter. Don't tell me the management doesn't know what's going on here. Do yourself a favor and find another place to stay."[70]

- In October of 2012, a reviewer described the Days Inn in Fort Myers, Florida as follows: "thought I was staying in a crackhead/prostitute hotel. [Y]our corporate office [should] really look at this place. [T]here were hookers conducting business right outside my front door and [I] had my children with me!"[71]

- In August of 2015, a reviewer described the Days Inn

[70] Review of the Travelodge by Wyndham Ozone Park (Feb. 22, 2012), *available at* https://www.tripadvisor.com/ShowUserReviews-g48355-d1474489-r125023778-Travelodge_by_Wyndham_Ozone_Park-Ozone_Park_Queens_New_York.html.

[71] Review of Days Inn by Wyndham Fort Myers, Fort Myers, FL (Oct. 10, 2012), *available at* https://www.tripadvisor.com/ShowUserReviews-g34230-d84524-r142467996-Days_Inn_by_Wyndham_Fort_Myers-Fort_Myers_Florida.html.

in Fort Myers, Florida as follows: "This motel is filled with drug dealers and prostitutes. The owner/[management] is well aware of this and does nothing about it. While there a woman overdosed and the police were there four times in other drug related issues... "[72]

- Regarding a June 2016 stay at the Travelodge in Fort Myers, Florida, a customer wrote: "This place is dirty. And plus the prostitutes and druggies that I saw was nasty. Even the maintenance man lives there and had prostitutes and drug addicts in his room. Horrible place!!"[73]

- Regarding an April 2017 stay at a Travelodge in West Springfield, Massachusetts, a customer wrote: "Prostitution is bad bad here all week long and the week end is worse!do not stay here! No sleep from people make so much noise,in the rooms and out side. Management does nothing to combat it! Could be a nice place if they clean it up, prostitution, and

[72] Review of Days Inn by Wyndham Fort Myers, Fort Myers, FL (Aug. 1, 2015), *available at* https://www.tripadvisor.com/ShowUserReviews-g34230-d84524-r294688173-Days_Inn_by_Wyndham_Fort_Myers-Fort_Myers_Florida.html.
[73] Review of the Travelodge by Wyndham Fort Myers (Jul. 8, 2016), *available at* https://www.tripadvisor.com/ShowUserReviews-g34230-d84533-r390411430-Travelodge_by_Wyndham_Fort_Myers-Fort_Myers_Florida html.

drugs ect. Police needs to stake it out" (sic).[74]

139.    BEST WESTERN INTERNATIONAL, INC. ("BWI")

a.  Defendant BWI owns, supervises, or operates the Best Western located at 4400 Ford Street Fort Myers, Florida 33916. BWI failed to implement and enforce any of its own policy or policies and protect Plaintiff C.T. from being sex trafficked.

b.  Defendant BWI has constructive knowledge of all sex trafficking occurring on all of its premises because it turned a blind eye to the issue and failed to attempt to comply with the TVPRA. This failure to even look is sufficient to implicate constructive knowledge to BWI for all sex trafficking ventures on every property.

c.  Defendant BWI had actual knowledge of sex trafficking occurring on its branded hotel properties because BWI and Best Western knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. BWI and Best Western allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Best Western. BWI and Best Western facilitated the trafficking through its practices, policies, and procedures. BWI and Best Western failed to take appropriate action to prevent the trafficking of individuals for sex so that BWI and Best Western could continue to profit

---

[74] Review of Travelodge West Springfield (Apr. 2, 2017), *available at* https://www.tripadvisor.com/ShowUserReviews-g41916-d1382745-r472028362-Travelodge_West_Springfield-West_Springfield_Massachusetts html.

from the business that trafficking brings, including business from out-of-state

d. Defendant BWI had constructive knowledge of sex trafficking occurring on its branded hotel properties because BWI and Best Western knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. BWI and Best Western allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Best Western. BWI and Best Western facilitated the trafficking through its practices, policies, and procedures. BWI and Best Western failed to take appropriate action to prevent the trafficking of individuals for sex so that BWI and Best Western could continue to profit from the business that trafficking brings, including business from out-of-state.

e. BWI knew or should have known that the Best Western® hotel where Plaintiff C.T. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff C.T. was trafficked.

f. Best Western brand hotel properties know and have known for more than a decade that criminal sex trafficking of adults and children repeatedly occurs on their properties throughout the country. Rather than take timely and effective measures to prevent human trafficking,

Best Western brand hotels, and their respective parent companies, have ignored signs they knew or should have known demonstrated human trafficking occurring within their branded hotel properties and continue to profit from traffickers renting rooms for the explicit and readily apparent purpose of human trafficking.

g. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant BWI has repeatedly failed to stop these actions.

h. Defendant BWI exercised control over Best Western® hotels by:

    i. distributing information to assist employees in identifying human trafficking;

    ii. providing a process for escalating human trafficking concerns within the organization;

    iii. requiring employees to attend training related to human trafficking;

    iv. providing new hire orientation on human rights and corporate responsibility;

    v. providing training and education to Best Western® branded hotels through webinars, seminars, conferences, and online portals;

    vi. securing, monitoring and controlling internet access;

    vii. developing and holding ongoing training sessions on human trafficking; or

viii. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

i. BWI was in an agency relationship with Best Western® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant BWI's exercise of an ongoing and systemic right of control over Best Western® hotels by Defendant BWI operations, including the means and methods of how Best Western® branded hotels conducted daily business through one or more of the following actions:

    i. hosting online bookings on Defendant BWI's domain;

    ii. requiring Best Western® branded hotels to use Defendant BWI's customer rewards program;

    iii. setting employee wages;

    iv. making employment decisions;

    v. advertising for employment;

    vi. sharing profits;

    vii. standardized training methods for employees;

    viii. building and maintaining the facility in a manner specified by the owner;

    ix. standardized or strict rules of operation;

    x. standardized internet security, network log, or Wi-Fi accessibility;

    xi. regular inspection of the facility and operation by owner;

xii. fixing prices; or other actions that deprive Best Western®
branded hotels of independence in business operations.

j. An apparent agency also exists between Defendant BWI and Best
Western® hotels. Defendant BWI held out Best Western® branded hotels
to the public as possessing authority to act on its behalf.

k. Given Defendant BWI's public statements on behalf of its hotel brands
and the control it assumed in educating, implementing, and directing its
branded hotels, including Best Western® branded hotels, Defendant
BWI breached its duties in the following ways:

i. did not adequately distribute information to assist employees in
identifying human trafficking;

ii. failed to provide a process for escalating human trafficking
concerns within the organization;

iii. failed to mandate managers, employees, or owners attend training
related to human trafficking;

iv. failed to provide new hire orientation on human rights and
corporate responsibility;

v. failed to provide training and education on human trafficking
through webinars, seminars, conferences, and online portals;

vi. failed to monitor security internet logs, network logs and servers
for high traffic from their hotel to escort and adult websites
signaling trafficking activity in their hotels;

vii. failed to develop and hold or require ongoing training sessions on

human trafficking; or

viii. failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

l. For years, Defendant BWI has failed to address the rampant culture of sex trafficking which tragically occurs on its Best Western Inn® branded properties throughout the country. This entrenched apathy to the real risk of sex trafficking and pervasive actual and/or constructive knowledge of sex trafficking on its properties facilitated the sex trafficking of Plaintiff C.T. at the Best Western Inn® that forms the basis of this complaint.

i. In July 2007, a manager of two Best Western hotels publicly announced that they had banned "prostitution related activities" on their premises, which included training employees how to identify prostitution and denying entry to suspected prostitutes and their clients.[75]

ii. In October 2007, a Best Western construction in the middle of an industrial area raised concerns from the local community about the hotel becoming a den of prostitution. Community board members and residents requested the hotel's owner to answer all of their questions about the site and provide details about the rooms,

---

[75] *Businesses Say No to Sex Tourism Industry*, THE TICO TIMES (Jul. 27, 2007), https://ticotimes.net/2007/07/27/businesses-say-no-to-sex-tourism-industry.

management, parking, and security. The building of hotels in industrial areas had become such a problem that the Borough President had called for a moratorium on such facilities in industrial areas.[76]

iii. In October 2008, two women were arrested on drug charges in a prostitution sting and eight men were arrested for soliciting sex at the Best Western Hotel in Rockland.[77]

iv. Additionally, Defendant BWI has been aware of sex trafficking on Best Western brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Best Western brand properties and Defendant BWI's inattentiveness, for example:

- Regarding a March 2016 stay at a Best Western Executive Inn in Seagoville, Texas, a customer wrote: "…At night there was a pimp and prostitute argument and the front desk allowed this to happen. Very loud until early in the morning. The front desk allows prostitution at night. Told the morning shift about it they didn't care…"[78]

---

[76] *Residents worry hotel may become den of prostitution*, NY DAILY NEWS (Oct. 30, 2007), https://www.nydailynews.com/new-york/bronx/residents-worry-hotel-den-prostitution-article-1.232160
[77] *One alleged prostitute is a former Marshfield High honor student*, THE PATRIOT LEDGER (Oct. 28, 2008), https://www.patriotledger.com/article/20081028/NEWS/310289571.
[78] Review of Best Western Executive Inn, Seagoville, TX (Mar. 23, 2016), *available at*

140. LA QUINTA HOLDINGS, INC. ("LQH"):

    a. Defendant LQH owns, supervises, or operates the La Quinta Inn® located at 4850 S. Cleveland Avenue Fort Myers, Florida 33907. LQH failed to implement and enforce any of its own policy or policies and protect Plaintiff C.T. from being sex trafficked.[79]

    b. Defendant LQH has constructive knowledge of all sex trafficking occurring on all of its premises because it turned a blind eye to the issue and failed to attempt to comply with the TVPRA. This failure to even look is sufficient to implicate constructive knowledge to LQH for all sex trafficking ventures on every property.

    c. Defendant LQH had actual knowledge of sex trafficking occurring on its branded hotel properties because LQH and La Quinta knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. LQH and La Quinta allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the La Quinta. LQH and La Quinta facilitated the trafficking through its practices, policies, and procedures. LQH and La Quinta failed to take appropriate action to prevent the trafficking of individuals for sex so that LQH and La Quinta continue to profit from the business that trafficking brings, including business from out-of-state.

https://www.tripadvisor.com/ShowUserReviews-g56648-d73227-r357822545-Best_Western_Executive_Inn-Seagoville_Texas.html.

[79] Upon information and belief, the La Quinta brand was acquired by Wyndham in May 2018.

d. Defendant LQH had constructive knowledge of sex trafficking occurring on its branded hotel properties because LQH and La Quinta knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. LQH and La Quinta allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the La Quinta. LQH and La Quinta facilitated the trafficking through its practices, policies, and procedures. LQH and La Quinta failed to take appropriate action to prevent the trafficking of individuals for sex so that LQH and La Quinta continue to profit from the business that trafficking brings, including business from out-of-state.

e. LQH knew or should have known that the La Quinta Inn® hotel where Plaintiff C.T. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff C.T. was trafficked.

f. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant LQH has repeatedly failed to stop these actions.

g. Defendant LQH exercised control over La Quinta Inn® hotels by:

    i. distributing information to assist employees in identifying human trafficking;

ii. providing a process for escalating human trafficking concerns within the organization;

iii. requiring employees to attend training related to human trafficking;

iv. providing new hire orientation on human rights and corporate responsibility;

v. providing training and education to La Quinta Inn® branded hotels through webinars, seminars, conferences, and online portals;

vi. securing, monitoring and controlling internet access;

vii. developing and holding ongoing training sessions on human trafficking; or

viii. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

h. LQH was in an agency relationship with La Quinta Inn® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant LQH's exercise of an ongoing and systemic right of control over La Quinta Inn® hotels by Defendant LQH's operations, including the means and methods of how La Quinta Inn® branded hotels conducted daily business through one or more of the following actions:

i. hosting online bookings on Defendant LQH's domain;

ii. requiring La Quinta Inn® branded hotels to use Defendant

LQH's customer rewards program;

iii. setting employee wages;

iv. making employment decisions;

v. advertising for employment;

vi. sharing profits;

vii. standardized training methods for employees;

viii. building and maintaining the facility in a manner specified by the owner;

ix. standardized or strict rules of operation;

x. standardized internet security, network log, or Wi-Fi accessibility;

xi. regular inspection of the facility and operation by owner;

xii. fixing prices; or

xiii. other actions that deprive La Quinta Inn® branded hotels of independence in business operations.

i. An apparent agency also exists between Defendant LQH and La Quinta Inn® hotels. Defendant LQH held out La Quinta Inn® branded hotels to the public as possessing authority to act on its behalf.

j. Given Defendant LQH's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including La Quinta Inn® branded hotels, Defendant LQH breached its duties in the following ways:

i. did not adequately distribute information to assist employees in identifying human trafficking;

ii. failed to provide a process for escalating human trafficking concerns within the organization;

iii. failed to mandate managers, employees, or owners attend training related to human trafficking;

iv. failed to provide new hire orientation on human rights and corporate responsibility;

v. failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi. failed to monitor security internet logs, network logs and servers for high traffic from their hotel to escort and adult websites signaling trafficking activity in their hotels;

vii. failed to develop and hold or require ongoing training sessions on human trafficking; or

viii. failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

k. For years, Defendant LQH has failed to address the rampant culture of sex trafficking which tragically occurs on its La Quinta Inn® branded properties throughout the country. This entrenched apathy to the real risk of sex trafficking and pervasive actual and/or constructive knowledge of sex trafficking on its properties facilitated the sex trafficking of Plaintiff C.T. at a La Quinta Inn® hotel that forms the basis of this complaint.

i. In August 2008, a woman was arrested for running an escort service out of various hotels in Bergen, Passaic, Hudson, and Essex counties, which included the La Quinta Hotel on Route 46.[80]

ii. In July 2009, a Cambridge pimp whose mom was a well-known political staple in the city was arrested after police found a woman set up in a prostitution scheme in the La Quinta Inn in Somerville.[81]

iii. In November 2013, the La Quinta Inn in San Diego, California was sued by the City Attorney's Office for its history of illegal activity. Police had made several prostitution arrests in a short span of time and often found several prostitutes on site at the hotel. In reaching a settlement with the property and franchise owners, the hotel agreed to toughen its policies, add cameras, and check identification of guests and visitors.[82]

iv. In February 2016, a La Quinta Inn owner was arrested during a prostitution bust. One woman was arrested for prostitution and the owner was arrested for tipping the woman off when police arrived. Police also said the owner knew that the woman was

---

[80] *Paterson woman charged with running local prostitution service*, THE PROGRESS (Aug. 15, 2008), available at https://www newjerseyhills.com/the_progress/news/paterson-woman-charged-with-running-local-prostitution-service/article_bb36894b-ee4c-5bdf-9b5c-e1873080b1f9 html.

[81] *Former state rep's son accused of being a pimp; says he was 'helping' hooker*, METROWEST DAILY NEWS (Jul. 1, 2009), https://www metrowestdailynews.com/article/20090701/News/307019964

[82] *City atty.: Hookers worked out of La Quinta Inn*, THE SAN DIEGO UNION-TRIBUNE (Nov. 21, 2013), https://www.sandiegouniontribune.com/sdut-la-quinta-inn-prostitution-rancho-penasquitos-2013nov21-story html.

using the room at the La Quinta to solicit prostitution.[83]

    v.   Additionally, Defendant LQH has been aware of sex trafficking occurring on La Quinta Inn brand properties through publicly available online review websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on La Quinta Inn brand properties and Defendant LQH's inattentiveness, for example:

- Regarding a January 2009 stay at a La Quinta Inn in Elmsford, New York, a customer wrote: "Also to make my trip exciting was the hooker that keeps going to the back door to meet her [trick]. Blondie has quit a business going on I smoke so I would go outside to have a [cigarette] and a few times I was approached by her trick and would have to tell him she was at the door waiting. It was very uncomfortable. Even my pregnant daughter was approached. By our third night a new hooker had come to stay."[84]

- Regarding a November 2013 stay at a La Quinta Inn in Milwaukee, Wisconsin, a customer wrote: "…The first thing I noticed when we pulled up was

---

[83] *La Quinta Inn Hotel Owner Arrested in Prostitution Bust*, SPECTRUM NEWS (Feb. 27, 2016), https://spectrumlocalnews.com/nys/buffalo/news/2016/02/27/hotel-owner-arrested-in-prostitution-bust.

[84] Review of La Quinta Inn & Suites by Wyndham White Plains – Elmsford, Elmsford, New York (Jan. 7, 2009), available at https://time.com/3525640/sex-trafficking-victim-prostitution-hotel/.

the obvious hooker outside… This hotel is SUPER gross. It's just a hang out for prostitutes and drug users. The staff is obviously either partaking, or allowing it to happen. Either way, this hotel management needs to think about hiring new people who won't turn their hotel into a sleazy, disgusting mess…"[85]

- Regarding an August of 2014 stay at the La Quinta Inn in Fort Myers, Florida, a customer wrote: "There was very obvious prostitution going on while we were there. I spoke to the lady at the front desk about it and she said that they had began a "NO CASH" policy back in September of last year and it had helped with the drug dealings and prostitution a lot, but they couldn't completely eliminate it."[86]

- Regarding a March 2016 stay at a La Quinta Inn in Sacramento, California, a customer wrote: "Unfortunately, this motel is used by many people who use drugs and many of the purchases occurred

[85] Review of La Quinta Inn by Wyndham Milwaukee Glendale Hampton Ave (Dec. 3, 2013), *available a*t https://www.tripadvisor.com/ShowUserReviews-g59917-d240573-r186657751-La_Quinta_Inn_by_Wyndham_Milwaukee_Glendale_Hampton_Ave-Glendale_Wisconsin.html.

[86] Review of La Quinta Inn by Wyndham Fort Myers Central (Aug. 4, 2014), *available at* https://www.tripadvisor.com/ShowUserReviews-g34230-d87561-r220389527-La_Quinta_Inn_by_Wyndham_Fort_Myers_Central-Fort_Myers_Florida html.

in the back parking lot. There were also prostitutes and their guests. If you're not into this I recommend you choose another motel."[87]

141.     RED ROOF INNS, INC. ("RRI"):

    a. Defendant RRI owns, supervises, or operates the Red Roof Inn® located at 13000 North Cleveland Avenue Fort Myers, Florida 33903. RRI failed to implement and enforce any of their own policy or policies and protect Plaintiff C.T. from being sex trafficked.

    b. Defendant RRI has constructive knowledge of all sex trafficking occurring on all of its premises because it turned a blind eye to the issue and failed to attempt to comply with the TVPRA. This failure to even look is sufficient to implicate constructive knowledge to RRI for all sex trafficking ventures on every property.

    c. Defendant RRI had actual knowledge of sex trafficking occurring on its branded hotel properties because RRI and Red Roof Inn knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. RRI and Red Roof Inn allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Red Roof Inn. RRI and Red Roof Inn facilitated the trafficking through its practices, policies, and procedures.

---

[87] Review of La Quinta Inn by Wyndham Sacramento North (Mar. 8, 2016), *available at* https://www.tripadvisor.com/ShowUserReviews-g32999-d79713-r354487204-La_Quinta_Inn_by_Wyndham_Sacramento_North-Sacramento_California.html.

RRI and Red Roof Inn failed to take appropriate action to prevent the trafficking of individuals for sex so that RRI and Red Roof Inn continue to profit from the business that trafficking brings, including business from out-of-state.

d. RRI knew or should have known that the Red Roof Inn® hotel where Plaintiff C.T. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff C.T. was trafficked.

e. RRI has been uniquely aware of sex trafficking occurring on RRI brand properties through publicly available review websites and stresses that it is "known for obsessively listening to consumers" and giving them its "full attention."[88]

f. RRI is obsessed with listening to its guests. "Starting with the top, *our president receives all of our TripAdvisor reviews to his email daily and actively speaks with Owners and General Managers about the reviews*."[89]

g. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant RRI has repeatedly failed to stop these actions.

h. Defendant RRI exercised control over Red Roof Inn® hotels by:

i. associating its name with all of its individual brands and properties,

---

[88] RedRoof, Media Center, available at https://www.redroof.com/media/; RedRoof, Red Roof Unveils Evolution of Extended Stay Brand HomeTowne Studios by Red Roof, available at https://www.redroof.com/media/press-release-4-24-2019; RedRoof, A History-and Future-of Steady Growth, available at https://www.redrooffranchising.com/about/our-history

[89] RedRoof, Why Red Roof?, available at https://www.redroof.com/why-red-roof-inn/ (emphasis added).

placing its name everywhere from physical signage to uniforms worn by employees;

ii. employing individuals throughout its hotel properties from front desk clerks, to cleaning personnel, to booking agents, to internet marketers and providing online tools to help people find jobs in RRI brands located throughout the United States;

iii. promoting a strong relationship between itself and its brands by promoting a "unique owner-operator experience" that promises RRI brands "full attention" and "Genuine Relationships";[90]

iv. providing its branded properties access to a brand-wide central reservation system, 800 numbers, revenue management tools, loyalty programs, and business reports;[91]

v. ensuring "high-quality" standards among its branded properties by dictating training, policies, and procedures used by its brands;

vi. distributing information to assist employees in identifying human trafficking;

vii. providing a process for escalating human trafficking concerns within the organization;

viii. requiring employees to attend training related to human trafficking;

---

[90] RedRoof, A History-and Future-of Steady Growth, available at https://www.redrooffranchising.com/about/our-history; RedRoof, Media Center, available at https://www.redroof.com/media/.

[91] RedRoof, A History-and Future-of Steady Growth, available at https://www.redrooffranchising.com/about/our-history; RedRoof, Media Center, available at https://www.redroof.com/media/ ("Red Roof offers franchisees Genuine Relationships. Real Results. ® — a unique owner-operator experience establishing common ground with franchisees. To join Red Roof's industry-leading loyalty program, RediRewards™, or for reservations, visit redroof.com or call 800.RED.ROOF.").

    ix.  providing new hire orientation on human rights and corporate responsibility;

    x.  providing training and education to Red Roof Inn® branded hotels through webinars, seminars, conferences, and online portals;

    xi.  securing, monitoring and controlling internet access;

    xii.  developing and holding ongoing training sessions on human trafficking; or

    xiii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

i.  RRI is in an agency relationship with Red Roof Inn® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant RRI's exercise of an ongoing and systemic right of control over Red Roof Inn® hotels by Defendant RRI's operations, including the means and methods of how Red Roof Inn® branded hotels conducted daily business through one or more of the following actions:

    i.  hosting online bookings on Defendant RRI's domain;

    ii.  requiring Red Roof Inn® branded hotels to use Defendant RRI's customer rewards program;

    iii.  setting employee wages;

    iv.  making employment decisions;

    v.  advertising for employment;

      vi.   sharing profits;

     vii.   standardized training methods for employees;

   viii.   building and maintaining the facility in a manner specified by the owner;

     ix.   standardized or strict rules of operation;

      x.   standardized internet security, network log, or Wi-Fi accessibility;

     xi.   regular inspection of the facility and operation by owner;

    xii.   fixing prices; or

   xiii.   other actions that deprive Red Roof Inn® branded hotels of independence in business operations.

j.   An apparent agency also exists between Defendant RRI and Red Roof Inn® hotels. Defendant RRI held out Red Roof Inn® branded hotels to the public as possessing authority to act on its behalf.

k.   Given Defendant RRI's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Red Roof Inn® branded hotels, Defendant RRI breached its duties in the following ways:

      i.   did not adequately distribute information to assist employees in identifying human trafficking;

     ii.   failed to provide a process for escalating human trafficking concerns within the organization;

    iii.   failed to mandate managers, employees, or owners attend training related to human trafficking;

iv. failed to provide new hire orientation on human rights and corporate responsibility;

v. failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi. failed to monitor security internet logs, network logs and servers for high traffic from their hotel to escort and adult websites signaling trafficking activity in their hotels;

vii. failed to develop and hold or require ongoing training sessions on human trafficking; or

viii. failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

l. For years, Defendant RRI has failed to address the rampant culture of sex trafficking which tragically occurs on its Red Roof Inn® branded properties throughout the country. This entrenched apathy to the real risk of sex trafficking and pervasive actual and/or constructive knowledge of sex trafficking on its properties facilitated the sex trafficking of Plaintiff C.T. at a Red Roof Inn® hotel that forms the basis of this complaint.[92]

    i. In February 2007, ten (10) arrests were made at the Red Roof Inn on Route 46 in which an undercover operation busted seven women for prostitution, two men for soliciting, and one man for

---

[92] RRI reports reviewing said reviews every day in order to be apprised of the events going on at their properties. *See, e.g.,* https://www.redroof.com/why-red-roof-inn/ (Red Roof Inns, Inc. president reviews online customer reviews daily).

promoting prostitution.[93]

   ii. In May 2009, undercover deputies set up stings at a Red Roof Inn in Naples, Florida in response to four separate prostitution advertisements on Craigslist.com.[94]

   iii. In October 2010, a man was arrested after meeting a woman at the Red Roof Inn, impersonating an officer, restraining her with zip ties, and proceeding to have sex with her.[95]

   iv. Additionally, Defendant RRI has been aware of sex trafficking occurring on Red Roof Inn brand properties through publicly available online review websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Red Roof Inn brand properties and Defendant RRI's inattentiveness, for example:

- Regarding a March 2008 stay at a Red Roof Inn in Phoenix, Arizona, a customer wrote a review titled, "Watch out for the Hookers" and further explained, "We stayed there for a tournament and there were lots of players there, and there were also hookers looking for some action."[96]

---

[93] *Police in Parsippany worry town is becoming hot spot for prostitution*, NEWS 12 NEW JERSEY (Feb. 9, 2007), http://newjersey news12.com/story/34879720/police-in-parsippany-worry-town-is-becoming-hot-spot-for-prostitution.

[94] *Sex ads: 4 women busted in Collier Internet prostitution sting*, NAPLES DAILY NEWS (May 14, 2009), http://archive.naplesnews.com/news/crime/sex-ads-4-women-busted-in-collier-internet-prostitution-sting-ep-398191823-343984242.html.

[95] *Police impersonator charged with prostitution, other crimes*, WAVE 3 NEWS (Oct. 21, 2011), https://www.wave3.com/story/15745127/police-impersonator-charged-with-prostitution-other-crimes/.

[96] Review of Red Roof Plus+ Phoenix West, Phoenix, Arizona (Mar. 19, 2008), available at

- Regarding a July 2013 stay at a Red Roof Inn in Atlanta, Georgia, a customer wrote: "There were prostitutes at a couple doors too. Around midnight we heard loud yelling and looked out our window. Seven (yes seven!) cop cars were directly in front of our room and were arresting someone as a prostitute stood 5 feet from our window…"[97]

- Regarding an August 2013 stay at a Red Roof Inn in Tulsa, Oklahoma, a customer wrote: "…at night there are prostitutes running around the back where apparently their pimp [l]ives… and the staff is aware of this… I saw the maintenance man actually pick up a hooker…"[98]

### F. THE SEX TRAFFICKING OF C.T.

142. At the age of 19, C.T. met her traffickers. Through the use of drugs, violence, and threats, C.T. was held captive and sold for sex by her traffickers at Defendants' hotels.

143. From approximately 2008 to 2010, the Plaintiff was repeatedly trafficked for sex at Days Inn, Travelodge, Best Western, La Quinta, and Red Roof Inn properties.

144. C.T. was subject to repeated instances of rape, physical abuse, verbal abuse,

https://www.tripadvisor.com/ShowUserReviews-g31310-d224757-r14398624-Red_Roof_Plus_Phoenix_West-Phoenix_Arizona html.

[97] Review of Red Roof Inn Atlanta – Smyrna/Ballpark (Jul. 7, 2013), *available at* https://www.tripadvisor.com/ShowUserReviews-g35266-d86803-r166599440-Red_Roof_Inn_Atlanta_Smyrna_Ballpark-Smyrna_Georgia.html

[98] Review of Red Roof Inn Tulsa Airport (Aug. 3, 2013), *available at* https://www.tripadvisor.com/ShowUserReviews-g51697-d101901-r170630924-Red_Roof_Inn_Tulsa_Airport-Tulsa_Oklahoma.html.

exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotels from 2008 to 2010.

145. C.T. was advertised for sale on craigslist's website from 2008 to 2010.

146. C.T. was repeatedly sold and purchased for commercial sex acts as a victim of sex trafficking. She was often sold to at least 12 "johns" per night.

147. C.T.'s traffickers purchased the rooms.

148. During the time C.T. was trafficked, she was constantly shuffled from hotel to hotel. The Plaintiff encountered the same hotel staff over the course of the time she was trafficked for sex at each of the Defendants' hotel properties, and hotel staff would have observed visible physical changes, such as bruising, to the Plaintiff's appearance.

149. While at the Defendant Hotels' properties, C.T. was watched and monitored by her traffickers to ensure she did not leave. Someone was with C.T. at all times of the day. Each buyer entering Defendants' Hotel properties was a non-paying guest and left shortly after he arrived. The foot traffic to the rooms was constant and voluminous.

150. Despite desperate pleas and screams for help, near escape despite the hotels unwillingness to assist, and after being beaten or choked at the Defendants' hotel properties, hotel staff ignored C.T. and did nothing to prevent the ongoing torture she endured while she was regularly trafficked for sex at Defendants' hotel properties.

151. On several occasions, C.T.'s traffickers injured her so badly that it may have been noticeable to employees at the property and the public. When police finally rescued her, she was under 100 pounds.

152. Plaintiff C.T.'s traffickers were arrested under human trafficking charges, and eventually pled guilty to forced prostitution charges.

153. Despite signs of human trafficking (physical deterioration, no eye contact, and duration of stay) and indicators of commercial sex activity (bottles of lubricants, boxes of condoms, used condoms in the trash, excessive requests for towels and linens, cash payments), Defendant Hotels failed to recognize or report Plaintiff C.T.'s trafficking. The Defendants harbored or otherwise facilitated a sex trafficking venture on their hotel properties and accordingly, financially benefited from the sex trafficking the Plaintiff suffered. Furthermore, the Defendants failed to prevent her continued victimization.

154. Prior to, during, and following the incidents described herein, the Defendants had actual and/or constructive notice of drug dealing, prostitution, violence, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. The Defendants failed to take any actions to curtail these activities.

155. Had the Defendants been paying attention to the activities being conducted at their hotels and on their properties, they would have noticed the red flags outlined above would have been impossible for them not to notice, and the ongoing victimization of C.T. would have ceased.

156. The impact of being starved, choked, beaten, and sex trafficked at the Defendants' hotel properties has forever emotionally and physically injured C.T. who, despite the many years since her escape suffers immensely as a result of the

horrors inflicted upon her at the Defendants' hotel properties.

157. As a direct and proximate result of these egregious practices on the part of the Defendant Hotels, C.T. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

158. Each Hotel Defendant had actual and/or constructive knowledge of trafficking occurring in almost epidemic fashion throughout their hotel properties, including in each branded property where the Plaintiff was trafficked through notice about the prevalence of sex trafficking generally and specific red flags displayed by the Plaintiff at each Hotel Defendant's branded property. Despite such knowledge, Hotel Defendants failed to mandate training or implement anti-trafficking policies or procedures such as cybersecurity measures or other Wi-Fi and internet access controls on their respective branded properties which would have prevented Plaintiff's trafficking. As a result, Hotel Defendants facilitated and participated in the sex trafficking of Plaintiff C.T. through room rentals to her traffickers. The Hotel Defendants received financial benefits and other incidental benefits related to room rentals to Plaintiff's traffickers such as continued promotion of its brand and franchise fees.

## CAUSES OF ACTION

### A. COUNT ONE – 18 U.S.C §1595 ("TVPRA")
### (Against All Defendants)

159. The Plaintiff C.T. incorporates each foregoing allegation.

160. C.T. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

161. The Defendants' acts, omissions, and commissions, taken separately

and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, to engage in violations of the TVPRA. At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of C.T. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

162. The Defendants have benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the demand and supply side of sex trafficking. Moreover, the Defendants directly benefitted from the sex trafficking of C.T. on each occasion they received payment for rooms, increased brand footing in the industry, received kickbacks from internet usage, or other benefits of value as a result of being harbored at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of C.T.'s injuries and damages.

163. C.T. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties.

### B. COUNT TWO – CONSPIRACY TO VIOLATE THE TVPRA
#### (Against All Defendants)

164. Plaintiff C.T. incorporates each foregoing allegation.

165. At all relevant times, the Defendants knowingly agreed, contrived, confederated, and acted in concert, aided and abetted and/or conspired to turn a blind eye to trafficking with the purpose of maintaining the profits and reputation of their Hotel Brands.

166. For over a decade, upon information and belief, Defendants, individually, jointly, and in conspiracy with each other as key leaders in the hotel and lodging industry and through common understanding and design, implemented a malicious, sophisticated and deceptive two-pronged strategy to profit from ventures that they knew or should have known violated the TVPRA as described above. First, Defendants promoted themselves and their industry as dedicated opponents of human trafficking. Second, Defendants, under cover of their carefully contrived guise of pursuing the end of human trafficking, worked together, in a way that could not be accomplished alone, to maintain practices, policies and procedures that allowed Defendants to financially benefit from illegal sex ventures in violation of the TVPRA, while also falling well short of the measures Defendants themselves championed in public.

167. Upon information and belief, despite the overwhelming data possessed by and available to the Defendants, Defendants individually, jointly and in conspiracy with each other willfully and maliciously:

    a. Withheld, concealed and suppressed information regarding human trafficking;

    b. Defendants, through AHLA and OHLA, used their influence over local, state and federal agencies to control material facts disclosed to the public.

168. As co-conspirators, Defendants are jointly and severally liable for C.T.'s trafficking at every property as a result of Defendants joint conspiracy to avoid compliance with the TVPRA.

169. Defendants' conspiracy to maintain practices, policies and procedures that

allowed Defendants' to financially benefit from illegal sex ventures in violation of the TVPRA caused injury to C.T. and other victims.

170. Defendants' conspiracy is a continuing conspiracy, and the overt acts performed in furtherance of the conspiracy's objective(s) are ongoing and/or have occurred within the last year.

171. Although independent from the conspiracy, Defendants' unlawful acts, omissions, and commissions described above were a direct result of Defendants' strategy. Defendants knew or should have known that their combined publicity campaigns and lack of proper policies, practices and procedures would support and encourage acts, omissions and commissions in violation of the TVPRA that led to unlawful commercial sex acts against C.T.

### C. COUNT THREE – CIVIL CONPSIRACY
### (UNDER OHIO AND FLORIDA LAW)
### (Against all Defendants)

172. Defendants caused C.T. to suffer substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties.

173. Plaintiff incorporates the preceding paragraphs by reference as if set forth fully in this section, unless inconsistent.

174. Defendants as co-conspirators have advertised to the public and law makers that they are taking action, while conspiring and colluding to take no meaningful action and turn a blind eye to human trafficking issues in order to continue obtaining the profits from renting rooms to individuals engaged in illegal activity.

175. Defendants jointly conspired to fail to comply with the TVPRA.

176. Plaintiff suffered and continues to suffer damages as a result of Defendants' ongoing conspiracy.

177. Plaintiff is entitled to compensatory damages, punitive damages, and equitable restitution as a result of Defendants' illegal conspirator acts.

## **PRAYER FOR RELIEF**

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

    a. All available compensatory damages for the described losses with respect to each cause of action;

    b. past and future medical expenses, as well as the costs associated with past and future life care;

    c. past and future lost wages and loss of earning capacity;

    d. past and future emotional distress;

    e. consequential and/or special damages;

    f. all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

    g. disgorgement of profits obtained through unjust enrichment;

    h. restitution;

    i. punitive damages with respect to each cause of action;

    j. reasonable and recoverable attorneys' fees;

k.  costs of this action; and

l.  pre-judgment and all other interest recoverable

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by struck jury.

Dated:  June 11, 2020                  **RESPECTFULLY SUBMITTED,**

/s/ Steven C. Babin, Jr.
Steven C. Babin, Jr. (0093584)
Babin Law, LLC
1320 Dublin Road, #100
Columbus, Ohio 43215
T: 614-384-7035
E: steven.babin@babinlaws.com

/s/ Kimberly Lambert Adams
Kimberly Lambert Adams
Fla. Bar No. 0014479
Kathryn L. Avila
Fla. Bar No. 1019574
Levin, Papantonio, Thomas, Mitchell,
Rafferty & Proctor, P.A.
316 S. Baylen St. Suite 600
Pensacola, FL 32502
T: 850.435.7056
F: 850.436.6056
E: kadams@levinlaw.com /

kavila@levinlaw.com

*Attorneys for Plaintiff C.T.*

# EXHIBIT A



## Who We Are

The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's {DHS) efforts to combat human trafficking. Working with law enforcement, government, and non-governmental and private organ'zations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.

## What's Inside?

This **toolkit** offers tips and **resources that** can **help you inform** and **educate** yovr **employees about human trafficking.**

**It** indudes posters of human trafficking warnjog signs **for four groups of employee;**

- Hotel and Motel Staff
- **Housekeeping, Maintenance and Room Staff**
- **Concierge, Bellman, Front Desk, Security and Valet** Staff
- **Food and Beverage Staff**

These **posters can be displayed** in **common areas of your business where employees** congregate (such as **staff break, laundry and** maintenance **rooms).**

**www dhs.gov/bluecamoaign**



# What is Human Trafficking?

Human trafficking is rrnodern-day slavery and involves the use of force, fraud or coercion to obtain labor or commercial sex. Every year, millions of men, women and children are trafficked in countries around the world, including the United States.

There are different types of human trafficking:

- Sex Trafficking
  Victims of sex traffickin g are manipulated or forced to engage i n sex acts for someone else's commercial gain. Sex trafficking is not prostitution.

  Anyone under the age of 18 engaging in commercial sex is considered to be a victim of human trafficking. No exceptions.

- Forced Labor
  Victims of forced labor are compelled to work for little or no pay, often manufacturing or growing the products we use and consume every day.

  Domestic Servitude
  Victims of domest c servitude are forced to work in isolation and are hidden in plain sight as nannies, housekeepers or domestic hep.

## Human traffi ckinc and the hospitality industry

Traffickers often take advantage of the privacy and anonymity offered by the hospitality industry. They can operate discreetty because staff and guests may not know the signs of human trafficking.

You may have employees who are victims of forced labor. If a third party appled for a position on behalf of an individual or if employees are not receiving their own paychecks, these could be signs of human trafficking.

Hotels and motels are also major locations where traffickers force sex trafficking victims to provide commercial sex to paying customers. Victims may be forced to stay at a hotel or motel where customers come to them, or they are required to go to rooms rented out by the customers.

## What actions can I take at my business to help stop human traffi ckinc?

You play a significant role in helping to stop this terrible crime by:

- Knowing the signs of human trafficking.
- Designing a plan of action to respond to reports of human trafficking in your business.
- Partnering with agencies that provide services to victims of human trafficking. In the case of lodging, consider offering vouchers to victims. Immediate housing for victims plays a vital role in beginning a victim's healing process.
- Providing employee training to help them understand and identify signs of human trafficking.
- Distributing and posting the fact sheets in this kit to your employees.

Inform:ation on additional resources, literature materials, and training offered by the Blue campaign can be found at www.dhs.gov/bluecamoaign.



# SIGNS OF **HUM**AN TRAFFICKING
## For Hoteland Motel Staff

Hotel and motel employees are often in the best position to see potential signs of human trafficking, especially since your duties give you access to different areas of the properties. You may also have direct or indirect contact with both traffickers and victims.

### GENERAL INDICATORS

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness.

- Individuals show signs of physical abuse restraint, and/or confinement.

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way.

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness injuries and/or unusual behavior.

- Individuals lack freedom of movement or are constantly monitored.

- Individuals avoid *eye* contact and interaction with others.

- Individuals have no control over or possession of money or IO.

- Individuals dress inappropriately for their rage or have Sower quality clothing compared to others in their party.

- Individuals have few or no personal items—such as no luggage or other bags.

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males.

- A group of girls appears to be traveling with an older female or male.

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- ℝ Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

- ◁❐ Call 9 1 1 for emergency situations— threats of violence, physical assault, emergency medical needs, etc.

- ℝ Follow your corporate protocol, such as by notifying management and security.

- ℝ Call 186S.OHS-2-ICE {1-866-347 2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.lre gpvftlps.

- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373 7888 or *text* HELP or INFO to BeFree {233733}.

www.d hs.gov/bluecampaign



# SIGNS OF **HUM**AN TRAFFICKING

For **Housekeeping, Maintenance, and Room Service** Staff



Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, you can help identify possible human trafficking activities and victims.

## GENERAL INDICATORS

- ..-Do Not Disturb" sign used constantly.
- Requests room or housekeeping services {additional towels, new linens, etc.), but denies hotel/motel staff entry into room.

  Refusal of cleaning services for multiple days.

  Excessive amounts of cash in a room.
- Smell of body fluids and musk.

  Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology.
- The same person reserving multiple rooms.
- Individuals leaving room infrequentty, not at all, or at odd hours.
- Children's items or clothing are prese.nt but no child registe red with the room.

- Individuals loitering in hallways or appearing to monitor the area.
- E)(ce.ssiw amounts of alcohol or illegal drugs in rooms.
- Evidence of pornography.
- Minors left alone in room for long periods of time.
- E)(cessiw number of people staying in a room.
- Extended stay with few or no pe rsonal possessions.
- Provocative clothing and shoes.
- Constant flow of men into a room at all hours.
- E)(cessiw amounts of sex paraphe rnatia in rooms {condoms, lubricant, lotion, etc.).
- Rooms stocted with merchandtse, luggage, ma il p:ackages, and purses/wallets with drtfe re nt names.

*Each indicator alone may not necessarily mean a person is being trafficked.*

## WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

® Do not at any time anempt to confront a suspected trafficke r d irectly or alert a victim to your suspicions.

◁D Call 9-1-1 for emergency situa tions— threats of violence, physical assault, e merge ncy med ical ne eds, etc.

® Follow your corporate protocol, such as by notifying management and security.

® Call 1-866-0HS-2-lCE {1-866-347-2423) to repon suspicious crimi:nat activity to federat law enf orce me nt. Highly trained specialists take re.ports from both the public and law enf orce ment agencies. Submit a tip at www.ice.gov/tips.

O To get help from the National Huma n Trafficking Resource Ce nter (NHTRC), catl 1-888-373-7888 or *text* HELP or INFO to BeFree {233733).

www.d hsgov/bluecampaign



# SIGNS OF HUMAN TRAFFICKING



For Concierge, Bellman, Front Desk, Security, and Valet Staff

Concierge, bellman, front desk, security, and valet staff are typically the first to see guests when they enter the hotel. When checking in or requesting hotel amenities, a guest may exhibit behavior indicating human trafficking.

## GENERAL INDICATORS

- Patrons checking into room appear distressed or injured.
- The same person reserving multiple rooms.
- Few or no personal items when checking in.
- Room paid for with cash or pre-loaded credit card.
- Excessive use of hotel computers for adult oriented or sexually explicit websites.
- Patrons not forthcoming about full names home address or vehicle information when registering.
- Minor taking on adult roles or behaving older than actual age (paying bills requesting services).
- Patron appears with a minor that he or she did not come with originally.
- Rentals of pornography when children are staying in the room.
- Individuals dropped off at the hotel or visit repeatedly over a period of time.

- Individuals leaving room infrequently, not at all, or at odd hours.
- Minor with a patron late night or during school hours (and not on vacation).
- Individuals checking into room have no identification.
- Room is rented hourly, less than a day, or for long-term stay that does not appear normal.
- Patrons request information or access to adult services or sex industry.
- Room rented has fewer beds than patrons.
- Individuals selling items to or begging from patrons or staff.
- Individuals enter/exit through the side or rear entrances, instead of the lobby.
- Car in parking lot regularly parted backward so the license plate is not visible.

*Each indicator alone may not necessarily mean a person is being trafficked.*

## WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- ® Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- ◁) Call 9-1-1 for emergency situations— threats of violence, physical assault, emergency medical needs, etc.
- ® Follow your corporate protocol, such as by notifying management and security.
- ® Call 1-866-0HS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- O To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign



# SIGNS OF HUMAN TRAFFICKING

For **Food** and **Beverage** Staff

Food and beverage staff may have access to a guest's room or see them using the hotel restaurant or bar. Be conscious of these signs indicating a guest may be a victim of human trafficking.

GENERAL INDICATORS

- Patron entertaining a minor at the bar or restaurant that he/she did not come in with originally.
- Patron claims to be an adult although appearance suggests he/she is a minor.
- Individuals loitering and soliciting male patrons.
- Individuals waiting at a table or bar and picked up by a male (trafficker or customer).
- Individuals asking staff or patrons for food or money.
- Individuals taking cash or receipts left on tables.

*Each indicator alone may not necessarily mean a person is being trafficked.*

WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

Ⓡ Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

(j) Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

Ⓡ Follow your corporate protocol, such as by notifying management and security.

Ⓡ Call 1–866-0HS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and *law* enforcement agencies. Submit a tip at www.ice.gov/tips.

(2) To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to Befree (233733).